IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE | ) | Case No. 16-39654 |
| | ) | |
| Argon Credit, LLC, et al., | ) | Chapter 7 |
| | ) | |
| Debtors. | ) | Hon. Deborah L. Thorne |
| | ) | (Jointly Administered) |

### **MEMORANDUM OPINION**

### **Introduction**

This matter comes before the court upon the motion of Lindsay Fore and others to modify the automatic stay so as to allow the movants to commence arbitration proceedings in California against Fund Recovery Services (FRS), the largest secured creditor in this case, and First Associates, the Debtor's pre-petition loan servicer. Since the claims sought to be arbitrated are non-core, and since they are covered by an arbitration clause by which FRS is bound, the court has no discretion to override the parties' pre-petition bargain. The motion to modify the automatic stay is granted.

**I.    General Background**

Argon Credit and Argon X (hereinafter "Argon")[1] are the Debtors in this case. Prior to filing a petition on December 16, 2016 seeking relief under chapter 11, Argon made on-line, small, high-interest rate loans to individual consumers. *See* FRS's Response to Mot. Relief from Stay, Docket No. 297, at 4. To finance its lending activity, Argon entered into a revolving line of credit loan agreement with Fintech. *See* FRS's Mot. Relief from Stay, Docket No. 35, at 2–3, ¶ 10. As consideration for and to secure repayment of the Fintech revolving loan, Argon granted

---

[1] The distinction between the two Debtors, though relevant to the nuances of some pre-petition transactions, is not material to any legal issue before the court and is therefore ignored for the sake of simplicity.

Fintech a security interest covering the receivable portfolio generated from the Argon on-line consumer loans. *Id.* at 3, ¶ 13. Later Fintech assigned all of its rights arising out of the Argon loan transaction, including its security interest(s), to Princeton, who in turn assigned all of its rights to FRS. *Id.* at 3, 4, ¶¶ 14, 17.

Immediately upon filing its petition, Argon asked the court to allow it to use FRS' cash collateral. *See* Argon's Emergency Mot. to Use Cash Collateral, Docket No. 9. After a lengthy hearing, the court ultimately denied the use as Argon was unable to provide adequate protection to FRS. *See* Order Denying Use of Cash Collateral, Docket No. 66. That same day, the case was converted to one under chapter 7. *See* Order Converting Debtors' Cases to Chapter 7, Docket No. 68. FRS asked for and was granted relief from the automatic stay to collect the receivables pursuant to its assigned agreement with Argon and applicable nonbankruptcy law. *Id.* The court granted an agreed order between the chapter 7 trustee and FRS allowing FRS to retain proceeds collected on the receivables portfolio up to the amount of FRS's allowed claim against Argon, with the receivables remaining property of the estate. *See* Stipulation and Agreed Order Regarding Liquidation of Debtors' Loan Receivables, Docket No. 129; FRS's Mot. Enforce Automatic Stay, Docket No. 266, at 3–4, ¶¶ 9–10.[2] As April 30, 2018, FRS's claim against the estate is approximately $30.513 million, and the principal amount of the receivables currently outstanding is approximately $19.931 million. *See* FRS's Supplement, Docket No. 307, at 1–2, ¶¶ 2–3. The final amount of collections on the Argon receivables is unknown, and collection continues to this day.

---

[2] As a consequence of the receivables remaining property of the estate, the estate is entitled to any surplus in collections over the amount of FRS's allowed claim. The estate remains liable to FRS as a claimant to the extent that there is any deficiency between the amount of FRS's claim and the amounts actually collected on the receivables.

## II. Immediate Background

In August of 2017, a small number of California borrowers initiated arbitration proceedings in California against Argon and First Associates, the latter of which had been Argon's pre-petition loan servicer. *See See* Lindsay Fore et al.'s Mot. Relief from Stay, Docket No. 289, at 6; Trustee's Mot. Sanctions, Docket No. 261, Ex. D, at 17. Through the arbitrations, the borrowers sought declarations that each of their loan contracts were void under California consumer lending law due to Argon's lack of compliance with several statutory provisions. *Id.* at 21–22, 26. In addition, they also sought monetary recoveries for illegal collection activities, premised largely on claims that attempts to collect a loan created by an illegal contract amounts to an illegal collection practice under the federal Racketeer Influenced and Corrupt Organizations Act (RICO) and several other California statutes pertaining to lending and collection practices. *Id.* at 22–26.

The trustee asked this court to enforce the automatic stay and prohibit the arbitration proceedings against Argon. *See* Trustee's Mot. Sanctions, Docket No. 261.  In December of 2017, Wilens and the borrowers dropped Argon, the Debtor, as a respondent/party to the arbitrations and named only FRS and First Associates as respondents. FRS's Mot. Enforce, Docket No. 266, at 12, ¶ 30; Trustee's Notice of Withdrawal, Docket No. 262. The trustee and FRS continued to seek enforcement of the automatic stay notwithstanding this fact. *See* FRS's Mot. Enforce, Docket No. 266; Trustee's Reply, Docket No. 271; Trustee's Adoption of FRS's Mot. Enforce, Docket No. 274. In February of this year, the court found that without an order modifying the automatic stay, the arbitrations were prohibited under section 362(a)(3) and should be dismissed without prejudice. *See* Order Enforcing Automatic Stay, Docket No. 278. The California borrowers have now filed a motion seeking relief from the stay to re-file their

arbitration complaints, naming only First Associates and FRS as respondents and still seeking a declaration of the loans' invalidity and a recovery of money from First Associates and FRS. *See* Lindsay Fore et al.'s Mot. Relief from Automatic Stay, Docket No. 289; *see also* Lindsay Fore et al.'s Mot Relief from Stay, Docket No. 289, Ex. 2, at 36–46.

### III. The Loan Agreements' Arbitration Clause

The arbitration clause contained in the loan agreement between Argon and each borrower is very broad. It begins by explaining arbitration: "In arbitration, a third party ("Arbiter") solves Disputes in a hearing ("hearing"). You, related third parties, and we *waive the right to go to court*." *See* Lindsay Fore et al.'s Mot Relief from Stay, Docket No. 289, Ex. 1, at 26 (emphasis added). As for parties, the clause covers "the parties, their heirs, *successors, assigns, and third parties related to any dispute*." *Id.* (emphasis added). All disputes are included within the clause's scope:

> In this Clause, the word 'Disputes' has the broadest possible meaning. This Clause governs all 'Disputes' involving the parties. This includes all claims even indirectly related to your application and agreements with us. This includes Disputes related to information you previously gave use. It includes all past agreements. It includes extensions, renewals, refinancing's [sic], or payment plans. It includes claims related to collections, privacy, and customer information. It includes claims about the Clause's validity and scope. It includes claims about whether to arbitrate.

*Id.* at 26–27. Any covered disputes are to be arbitrated not more than 30 miles from the borrowers' homes. *Id.* at 29. The Federal Arbitration Act governs the arbitration clause. *Id.* at 27.

The California borrowers seek modification of the stay to allow them to proceed, pursuant to their arbitration agreement, with the arbitrations against FRS and First Associates.[3]

---

[3] Since First Associates has not appeared or made any argument, the court will substantively consider only FRS in the discussion below. The court will assume, for instance, that First Associates could properly be compelled to arbitrate notwithstanding the fact that it was only a loan servicer and not a signatory to the agreement containing the arbitration provision. This assumption is supported by the very broad scope of the arbitration provision.

FRS does not want to arbitrate the claims, and the trustee has joined with FRS despite not being named as a party/respondent to the arbitration proceedings. *See* Trustee's Response, Docket No. 294; FRS's Response, Docket No. 297. The trustee and FRS argue that the borrowers should file claims against the estate, or that they should file an adversary proceeding in the Bankruptcy Court seeking their currently requested relief against First Associates and FRS or, finally, that they could simply await an affirmative lawsuit or arbitration complaint to be filed against them for collections purposes, since they would not be barred by the automatic stay from raising the loans' invalidity as a *defense*. *See* FRS's Response, Docket No. 297, at 11–12, ¶ 27 & n.5; Trustee's Response, Docket No. 294, at 5.

As explained more fully below, the court grants the motion to modify the stay allowing the California borrowers to proceed to initiate arbitrations in California.

**Discussion**[4]

The petitioning California borrowers seek in their arbitration complaints a determination that their loan agreements are void under California law. Additionally, each of the petitioning borrowers seeks damages and other relief against First Associates and FRS. Seeking that voidness declaration amounts to a positive act to exercise control over property of the estate – the loan contracts – due to the likelihood that the Debtor and/or the estate would be bound by that part of the arbitration award finding the loan contracts invalid despite not having been made a party to the arbitration proceedings.[5] *See* 11 U.S.C. § 362(a)(3); *Nat'l Tax Credit Partners, L.P.*

---

[4] Subject matter jurisdiction to hear and determine this matter exists by virtue of 28 U.S.C. §§ 1334(a)–(b), 157(a), (b)(2)(G). This court has the constitutional authority to hear and finally determine this matter because a proceeding to obtain relief from the automatic stay "stems from the bankruptcy itself" in that such a proceeding could not exist in the absence of a bankruptcy case. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011).

[5] In other words, if there were no possibility of non-party preclusion, the automatic stay would not have been implicated in the first instance, since in that case the estate's property – its contract rights – could not possibly have been affected by the arbitrations' outcome. It is important to note that the automatic

5

*v. Havlik*, 20 F.3d 705, 708 (7th Cir. 1994) ("362(a)(3), however, reaches farther, encompassing every effort to "exercise control over property of the estate."); *In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 83 (Bankr. S.D.N.Y. 2015); *In re Stinson*, 221 B.R. 726, 730 (Bankr. E.D. Mich. 1998) (discussing the exercise of control over intangible property rights belonging to the estate); *Acands, Inc. v. Travelers Cas. & Sur. Co.*, 435 F.3d 252, 260 (3d Cir. 2006) ("By effectively terminating [the debtor's] insurance coverage, the arbitration award had a clear adverse effect on [the debtor's contractual right, which was a] property interest."); *In re Coporacion de Servicios Medicos Hospitalarios de Fajardo*, 805 F.2d 440, 447 (1st Cir. 1986) (concluding, after holding exceptions inapplicable, that "the actions taken . . to terminate the [debtor's contract] violated the automatic stay"); *In re Nat. Century Fin. Enterprises, Inc.*, 423 F.3d 567, 578 (6th Cir. 2005); *In re Gucci*, 126 F.3d 380, 392 (2d Cir. 1997); *In re Johnson*, 548 B.R. 770, 797 (Bankr. S.D. Ohio 2016); *In re Klarchek*, 508 B.R. 386, 397 (Bankr. N.D. Ill. 2014) (noting that the risk of non-party preclusion justifies the application of section 362(a)(3)).[6]

---

stay does not *otherwise* independently protect FRS or First Associates from damages actions. *See, e.g.*, *Fox Valley Const. Workers Fringe Ben. Funds v. Pride of Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998) ("The stay, however, protects only the debtor, unless the debtor and some third party have such a similarity of interests that failure to protect the third party will mean that the *assets of the debtor itself* will fall into jeopardy.") (emphasis added). That is, the seeking of damages in the arbitrations from FRS and First Associates for their collection activity has only been stayed in the first place because of the fact that the legal theories asserted to recover those damages from those third-parties require a necessary finding that the loan contracts on which the collection activity is based are void or invalid, with the loan contracts at issue being property of the estate.

[6] On the risk of non-party preclusion, see *S.E.C. v. Conaway*, 695 F. Supp. 2d 534, 544 (E.D. Mich. 2010) (discussing *Taylor v. Sturgell*, 553 U.S. 880 (2008)). It is difficult to evaluate the chances of non-party preclusion in advance, since the decision to hold a non-party bound by a prior judgment or award is one of fact and can only be made after analyzing the conduct of the proceedings giving rise to the judgment or award. *See Donovan v. Estate of Fitzsimmons*, 778 F.2d 298, 301 (7th Cir. 1985); *Glob. Live Events v. Ja-Tail Enterprises, LLC*, No. CV 13-8293 SVW, 2014 WL 1830998, at *3 (C.D. Cal. May 8, 2014). Given Argon's status as a signatory to the arbitration agreement, its clear notice of the arbitration proceedings, and the fact that neither it nor FRS want to see the loan contracts declared invalid, the possibility of non-party preclusion is not trivial. *See Taylor*, 553 U.S. at 900 (discussing the requirements for privity); *Stevens v. Interactive Fin. Advisors, Inc.*, No. 11 C 2223, 2015 WL 791384, at *7 (N.D. Ill. Feb. 24, 2015) (applying a privity analysis to determine the preclusive effect of an arbitration award) (citing *Gambino v. Koonce*, 757 F.3d 604, 608 (7th Cir. 2014)), *aff'd in part*, 830 F.3d 735 (7th Cir. 2016).

6

I. **The Court's Discretion to Continue Staying Arbitration where the Parties are Bound by a Valid Agreement to Arbitrate**

The question here is whether "cause" exists to lift the stay to allow the arbitrations to go forward despite their potential impact on property of the estate. 11 U.S.C. § 362(d)(1). Where a party has agreed to arbitrate the dispute at issue or is otherwise bound to arbitrate the dispute at issue, the court generally has no discretion to continue staying the arbitration proceedings unless the arbitration proceedings are "core" proceedings; that is, non-core issues properly covered by the arbitration clause must be submitted to arbitration where the parties have so agreed or where a party is otherwise bound by the arbitration agreement. *See MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 108 (2d Cir. 2006); *Matter of Nat'l Gypsum Co.*, 118 F.3d 1056, 1066 (5th Cir. 1997); *In re Cooker Rest. Corp.*, 292 B.R. 308, 312 (S.D. Ohio 2003); *In re Hermoyian*, 435 B.R. 456, 462–63 (Bankr. E.D. Mich. 2010); *Nw. Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 321 B.R. 120, 122–23 (Bankr. D. Del. 2005). The analysis is the same even where the issue is presented by way of a motion to modify the automatic stay rather than as a motion to compel arbitration. *See In re Enron Corp.*, 364 B.R. 489, 517 (Bankr. S.D.N.Y. 2007) (employing this analysis in discussing whether to lift the stay); *In re Phico Grp., Inc.*, 304 B.R. 170, 174–75 (Bankr. M.D. Pa. 2003) (same).

An inquiry into whether the proceeding is statutorily "core" is relevant because the overarching issue in deciding whether or not to allow arbitration to go forward despite the automatic stay is the issue as to whether *Congress* "intended to preclude a waiver of judicial remedies for [the particular claim] at issue." *In re Eber*, 687 F.3d 1123, 1129 (9th Cir. 2012) (quoting *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)); *In re Edgerton*, 98 B.R. 392, 394 (Bankr. N.D. Ill. 1989). A strong countervailing federal bankruptcy interest must exist in order to overcome the parties' pre-petition bargain to arbitrate their disputes, since there

is a strong federal interest in enforcing *agreements* to arbitrate, *see Gotham Holdings, LP v. Health Grades, Inc.*, 580 F.3d 664, 666 (7th Cir. 2009). Non-core proceedings ordinarily do not implicate strong countervailing federal bankruptcy interests warranting the centralization of dispute resolution in the Bankruptcy Court forum at the expense of the parties' pre-petition bargain. *See In re Penson Worldwide*, 587 B.R. 6, 14 (Bankr. D. Del. 2018); *see also Gypsum*, 118 F.3d at 1068 ("There can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith."); *Hays & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1161–62 (3d Cir. 1989).

## II. The Reach of the Arbitration Clause

Here, whether the issue regarding the contracts' validity under California law is an issue covered by the scope of the arbitration clause is, in the first instance, likely a question for the arbitrator. *Miller v. Flume*, 139 F.3d 1130, 1134 (7th Cir. 1998); *Local 744, Int'l Bhd. of Teamsters v. Hinckley & Schmitt, Inc.*, 76 F.3d 162, 165 (7th Cir. 1996). On the face of things, however, the clause quite clearly seems to cover that issue,[7] and that issue may be arbitrated despite the fact that the dispute goes to the very validity of the contract containing the arbitration provision. *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46 (2006); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967).

Whether FRS as a party has agreed to arbitrate or is bound to arbitrate is a question for the court.[8] *BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1206–07 (2014); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 941, 943–47 (1995); *John Wiley & Sons, Inc.*

---

[7] Recall that the disputes covered by the clause are "All Disputes," the word "Disputes" having "the broadest possible meaning . . . ."

[8] FRS has affirmatively placed this issue before the court. *See* FRS's Response, Docket No. 297, at 8 n.4.

*v. Livingston*, 376 U.S. 543, 546–47 (1964); *Wisconsin Local Gov't Prop. Ins. Fund v. Lexington Ins. Co.*, 840 F.3d 411, 414–15 (7th Cir. 2016); *Lakah v. UBS AG*, No. 07-CV-2799 (LAP), 2016 WL 4257527, at *4–5 (S.D.N.Y. July 29, 2016) (noting that even where the parties to the arbitration agreement delegate this type of question to the arbitrator, the question as to whether a non-party to the agreement is bound to arbitrate by the provisions of the agreement is a question for the court); *Di Martino v. Dooley*, No. 08 CIV.4606 (DC), 2009 WL 27438, at *3–4 (S.D.N.Y. Jan. 6, 2009). The text of the clause itself clearly covers FRS. *See* Mot. Relief from Stay, Docket No. 289, Ex. 1, at 26 (stating that the arbitration clause covers "the parties, their heirs, *successors*, *assigns*, and third parties related to any Dispute") (emphasis added).

FRS cannot escape the reach of the clause by arguing that it is a mere secured party with a security interest in the loan contracts, and the receivables generated thereby, rather than either an outright assignee of those contracts or the original party to those contracts. Its security interest attaches only to whatever rights Argon has, broad or limited as those rights may be. As the ultimate assignee of a security interest in the loan contracts containing the arbitration clause, FRS is indeed bound to arbitrate to the same extent that Argon would be. As put by the District Court for the Southern District of New York on a similar set of facts:

> To finance its purchase of oil for resale to Amoco [Article 9 Account Debtor] under the terms of [Part II of the exchange agreement] . . . Quasar [Article 9 Debtor/Obligor] obtained a *loan from Paribas* [Article 9 Secured Party]. The *loan* was *secured* by a preexisting assignment to Paribas of Quasar's accounts receivable on the exchange agreement . . . . Were Paribas an assignee of the contract between Amoco and Quasar, it would no doubt be required to arbitrate this dispute. Paribas *correctly* contends, however, that it is *not an assignee* of Quasar's contract with Amoco, but merely the assignee of a *security interest in the receivable* created by Quasar's performance. . . . But the case law supports the basic principle than an assignee or *other party whose rights are premised on a contract* is <u>bound by the remedial provisions bargained for between the original parties to the contract</u> [Quasar and Amoco].

9

*Banque de Paris et des Pays-Bas v. Amoco Oil Co.*, 573 F. Supp. 1464, 1467, 1469 (S.D.N.Y. 1983) (emphasis added); *see also Sea Spray Holdings, Ltd. v. Pali Fin. Grp., Inc.*, 269 F. Supp. 2d 356, 361–62 (S.D.N.Y. 2003) (treating a secured party with a security interest in a note as an assignee of the Article 9 debtor's interest(s) in the note; noting that "[the secured party] is not entitled to any more rights than [the debtor] because [the debtor] cannot convey, through the Security Agreement or otherwise, an interest greater than that which it possessed"); *see also Cone Constructors, Inc. v. Drummond Cmty. Bank*, 754 So. 2d 779, 780–81 (Fla. Dist. Ct. App. 2000) (per curiam) (applying this reasoning under Florida's version of the Uniform Commercial Code); *accord* U.C.C. 9–203 cmt. 6 ("However, in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be."); U.C.C. 9–404(a).[9] FRS is therefore bound by the arbitration provision to the same extent as the original parties to that provision.

### III. Is the Claim or Issue Concerning the Validity of the Loan Contracts "Core"?

> Core proceedings are actions by or against the debtor that arise under the Bankruptcy Code in the strong sense that the Code itself is the source of the claimant's right or remedy, rather than just the procedural vehicle for the assertion of a right conferred by some other body of law, normally state law.

*Matter of U.S. Brass Corp.*, 110 F.3d 1261, 1268 (7th Cir. 1997) (discussing 28 U.S.C. § 157(b)(2)).

---

[9] As noted in the background discussion above, FRS took its security interest in the loan contracts by assignment from a prior secured party, but its rights are the same as those of its predecessors in interest, including FRS's ultimate predecessor-in-interest, Fintech, the original grantee of the security interest in the Debtor's loan contracts and the receivables generated thereby. *See, e.g.*, *Hendrie v. Sayles*, 98 U.S. 546, 550–51 (1878); *In re Boyajian*, 367 B.R. 138, 145 (B.A.P. 9th Cir. 2007), *aff'd*, 564 F.3d 1088 (9th Cir. 2009).

First, it must be noted that the arbitrations at issue are neither actions by nor against the Debtor; rather, they are actions by third-parties against third-parties. This fact weighs against core classification.[10] Further, the arbitrations do not arise under the Code in the "strong sense" that the Code itself is the source of the borrowers' rights or remedies. Rather, the pertinent issue to be arbitrated is one of California law.

Is the claim or issue as to the loan contracts' validity constitutionally core? An issue is constitutionally core if it "stems from the bankruptcy itself or would necessarily be resolved in claims allowance process." *Stern v. Marshall*, 564 U.S. 462, 499 (2011); *Moses v. CashCall, Inc.*, 781 F.3d 63, 70 (4th Cir. 2015); *In re Kiskaden*, 571 B.R. 226, 235 (Bankr. E.D. Ky. 2017).[11] The issue as to the loan contracts' validity plainly does not stem from the bankruptcy itself. It will also not necessarily be resolved in the claims allowance process. None of the borrowers has filed a proof of claim against this estate; none is seeking any recovery from this estate.

---

[10] The court notes here that, ordinarily, the original party to a contract (here the Debtor, Argon) is a necessary party in any action seeking to have the contract held void or invalid. *Kleinschmidt v. Kleinschmidt Labs.*, 89 F. Supp. 869, 871 (N.D. Ill. 1950); *Nomanbhoy v. Boxwalla*, No. 12 C 5969, 2013 WL 329038, at *5 (N.D. Ill. Jan. 29, 2013); *see also Shields v. Barrow*, 58 U.S. 130, 139–40 (1854). Arbitrators are not bound to follow the rules of judicial procedure, however. *Chelmowski v. AT & T Mobility LLC*, No. 14 C 7283, 2015 WL 231811, at *2 (N.D. Ill. Jan. 15, 2015), *aff'd*, 615 F. App'x 380 (7th Cir. 2015); *see also Commercial Solvents Corp v. Louisiana Liquid Fertilizer Co.*, 20 F.R.D. 359, 361–63 (S.D.N.Y. 1957). There is nothing in the arbitration agreement indicating an intent to have the ordinary civil rules applied to any arbitration proceeding.

[11] Whether or not the proceeding at issue is *constitutionally* core is relevant to statutory "coreness" because it has been judicially recognized that "Congress intended that 'core proceedings' [in section 157] would be interpreted broadly, *close to or congruent with constitutional limits*." *See, e.g.*, *In re Ben Cooper, Inc.*, 896 F.2d 1394, 1398 (2d Cir. 1990) (emphasis added) (quoting *In re Arnold Print Works, Inc.*, 815 F.2d 165, 168 (1st Cir. 1987)). It is important that constitutional coreness has a strong connection with statutory coreness because the overarching inquiry with respect to arbitration and bankruptcy is whether or not **Congress** "intended to preclude a waiver of judicial remedies for [the particular claim] at issue." *Eber*, 687 F.3d at 1129. If there were no connection between constitutional coreness and statutory coreness, then the question as to whether or not a proceeding is constitutionally core would be irrelevant in determining *Congress's* intent to preclude a judicial remedy for the dispute at issue that is being sought to be arbitrated.

11

FRS does briefly make an argument premised on *Moses*. FRS's Response, Docket No. 297, at 8 n.4. There, the Court of Appeals held that a claim seeking to declare a loan illegal and unenforceable was statutorily and constitutionally core. *Moses*, 781 F.3d at 70. In that case, however, it was the *debtor* seeking to have the loan held unenforceable, and the lender had *in fact* filed a proof of claim against the estate. *Id.* at 68, 70. Since the lender's entitlement to the assets of the bankruptcy estate obviously depended on the validity of the loan that it had made to the debtor, the Court of Appeals had no trouble concluding that the debtor's action involved the "allowance or disallowance of claims against the estate," 28 U.S.C. § 157(b)(2)(B), and would "necessarily be resolved" in adjudicating the lender's proof of claim and the objections to that proof. *Id.* at 70; *see also Stern*, 564 U.S. at 499.

Here, by contrast, debtors of the bankruptcy Debtor, Argon, are asserting claims against third parties. A successful outcome for the borrowers may estop the Debtor from contesting the validity of the loans in some later proceeding,[12] but in no way does the matter sought to be arbitrated involve the allowance or disallowance of claims against this estate, nor would it *necessarily* be resolved in adjudicating any proof of claim currently filed against this estate. *Cf. Matter of Wood*, 825 F.2d 90, 97–98 (5th Cir. 1987) (discussing the importance of looking to both the *form* and the substance of an action in addressing whether it is core or non-core). *Moses* is therefore distinguishable on its facts.

It could be argued that the arbitration proceedings are "matters concerning the administration of the estate" or "other proceedings affecting the liquidation of the assets of the estate." *See* 28 U.S.C. § 157(b)(2)(A), (O). The only real assets of the estate are the loan contracts and the receivables generated thereby – certainly a proceeding concerning the validity

---

[12] This would be due to principles of non-party issue preclusion.

of those loan contracts concerns the administration of the estate and affects the liquidation of the assets of the estate. *Cf. In re Bucyrus Grain Co., Inc.*, 56 B.R. 204, 206 (Bankr. D. Kan. 1986); *In re Satelco, Inc.*, 58 B.R. 781, 787–90 (Bankr. N.D. Tex. 1986).

Sections 157(A) and (O), however, may not be read to "obliterate the core/non-core distinction itself." *In re MF Glob. Holdings Ltd.*, 571 B.R. 80, 95 (Bankr. S.D.N.Y. 2017) (internal quotations omitted). Instead, whether a proceeding concerning a contract is core depends on "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999) (citing and discussing *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)). Proceedings to obtain declaratory relief with respect to a contract, such as a proceeding to have the contract held invalid or void, are properly considered proceedings concerning a contract. *See In re EMS Fin. Servs., LLC*, 491 B.R. 196, 203 (E.D.N.Y. 2013).

Here, the contracts at issue were all entered into prior to the Debtor's bankruptcy petition. The validity of those contracts under California law depends on the circumstances existing at the time of their formation. Simply put, the arbitrations concern pre-petition, not post-petition contracts. *U.S. Lines, Inc.*, 197 F.3d at 637 (looking to whether the contract was "antecedent to the reorganization petition").

Moreover, there is no reorganization here – this case has long been a liquidation under chapter 7. *U.S. Lines, Inc.*, 197 F.3d at 637 (looking to the "degree to which the proceeding is independent of the *reorganization*") (emphasis added); *cf. In re Midwest Emery Freight Sys., Inc.*, 48 B.R. 566, 569 (Bankr. N.D. Ill. 1985) (noting the distinction between reorganizations and liquidations); *Matter of Fernstrom Storage & Van Co.*, 938 F.2d 731, 736 (7th Cir. 1991)

13

(looking to whether allowing the suit to go forward would impede "[the Debtor's] ability to *reorganize*") (emphasis added); *In re White Mountain Mining Co., L.L.C.*, 403 F.3d 164, 170 (4th Cir. 2005).

Thus, because the arbitration proceedings concern the validity of contracts entered into prior to the petition, and because there is no ongoing reorganization, those proceedings are properly considered non-core despite the fact that they may fit within the literal language of sections 157(b)(2)(A) and (O).

In sum, the arbitration proceedings to determine the validity of the estate's pre-petition loan contracts under California law are non-core. The issue as to their validity has been agreed to be arbitrated and is properly arbitrable. This court has no discretion to deny the California borrowers the use of their bargained-for dispute resolution mechanic. For those reasons, the automatic stay will be modified so as to allow the arbitrations against FRS and First Associates to commence.[13]

**Conclusion**

In accordance with the foregoing, it is hereby ORDERED, ADJUDGED, and DECREED that:

(1) Jeffrey Wilens's motion on behalf of Lindsay Fore, Kim L. King, Theresa Madrigal, Yolanda J. McKinney, Karensa Hutchens, Patti M. Couture, Rosemary Gonzalez-Lopez, Steven Prescott, Karen Vinson, Dean Sipe, Stephen Craig Brown, Dennis B. Estrada-Jiminez, Samantha Rae Wilder, Tiffany N. Comfort, John K. Brigoli, Dennis C. Cantrell, Mathew V. Muniz, Joseph N. Roberson, Donald Dotson, Felicia M.

---

[13] Any resulting awards may remain unconfirmed or may be confirmed in any court of competent jurisdiction.

      Spiller, Delilah Jasso Rodriguez, John Fountaine, Sonja Hallmon, and Eric Shorter

      for relief from the automatic stay is GRANTED; and

(2) At the conclusion of the arbitration proceedings, Jeffrey Wilens shall report the

      outcome of the arbitration proceedings to this court.

Date:  September 21, 2018

                                       Honorable Deborah L. Thorne
                                       United States Bankruptcy Judge