# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| IN RE: | ) | Case No. 16-39654 |
|  | ) | (Jointly Administered) |
| ARGON CREDIT, LLC, *et al.*, | ) |  |
|  | ) | Chapter 7 |
| Debtors. | ) |  |
|  | ) | Hon. Deborah L. Thorne |

---

|  |  |  |
|---|---|---|
|  | ) |  |
| EUGENE CRANE, the duly appointed and serving Chapter 7 Trustee for the estates of Argon Credit, LLC and Argon X, LLC, | ) ) ) |  |
|  | ) | Case No. 18-ap-_____ |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| MARGON LLC, LITTLE OWL ARGON, LLC, MARK TRIFFLER as trustee of MARK TRIFFLER DECLARATION OF TRUST DATED DECEMBER 5, 1991, and BARRY EDMONSON as trustee of THE CARDINAL TRUST, | ) ) ) ) ) ) |  |
|  | ) |  |
| Defendants. | ) |  |

## <u>COMPLAINT</u>

Eugene Crane, the chapter 7 trustee (the "*Trustee*") for the estates of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*," together with Argon Credit, the "*Debtors*"), by and through his undersigned counsel, files this complaint (the "*Complaint*") against Margon LLC ("*Margon*"), Little Owl Argon, LLC ("*Little Owl*"), Mark Triffler as trustee of Mark Triffler Declaration of Trust Dated December 5, 1991 (the "*Triffler Trust*"), and Barry Edmonson as trustee of The Cardinal Trust ("*Cardinal Trust*" together with Margon, Little Owl, and Triffler Trust, the "*Defendants*").  For his Complaint, the Trustee states as follows:

## NATURE OF THIS ACTION

1.      This action arises out of a series of transactions between Argon Credit and the Defendants by which the Defendants purportedly loaned funds to Argon Credit and Argon Credit made supposed principal and interest payments to the Defendants totaling more than $2.5 million on account of those purported loans.  However, Argon Credit and the Defendants also entered into simultaneous subscription agreements by which the Defendants received equity in Argon Credit for no additional consideration and which was commensurate with the amount of their purported loans.  In reality, these supposed loans were disguised equity contributions and Argon Credit's principal and interest payments to Defendants were actually equity distributions.

2.      Argon Credit was insolvent at the time of each of the $2.5 million in payments to Defendants and, accordingly, the Trustee seeks to avoid and recover those transfers as fraudulent under section 548 of title 11 of the United States Code (the "*Bankruptcy Code*").

## PARTIES

3.      The Trustee is the duly appointed chapter 7 trustee of the Debtors' bankruptcy estates.

4.      Margon is an Illinois limited liability company and member of Argon Credit, with its principal place of business in Burr Ridge, Illinois.

5.      Little Owl is a Florida limited liability company and member of Argon Credit, with its principal place of business in Milwaukee, Wisconsin.

6.      Triffler Trust is a trust and member of Argon Credit.  On information and belief, Mark Triffler is the trustee for Triffler Trust and is an individual with a principal residence located in Lemont, Illinois.

7.      Cardinal Trust is a trust and member of Argon Credit.  On information and belief, Barry Edmonson is the trustee for Cardinal Trust and is an individual with a principal residence located in Shorewood, Illinois.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334. The statutory predicates for the relief requested herein are sections 105(a), 502(b), 502(d), 502(j), 547, 548, and 550 of the Bankruptcy Code,  28 U.S.C. § 2201 and 6 Del. C. § 18-607.

9.      This Complaint is a core proceeding under 28 U.S.C. § 157(b)(2) and the Trustee consents to entry of a final judgment by the United States Bankruptcy Court for the Northern District of Illinois (the "*Court*").

10.      Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## BACKGROUND

### A.  The Debtors' Business Operations

11.      Argon Credit was formed as a Delaware limited liability company on October 15, 2013. Argon X was formed as a Delaware limited liability company on April 23, 2015. However, Argon Credit did not begin significant business operations until late 2014.

12.      The Debtors operated a state-by-state consumer loan origination business. Certain non-debtor affiliates executed the loans and the loans were funded and serviced by Argon Credit.  Argon X purchased the consumer loans from the non-debtor affiliates and Argon Credit serviced the loans.

13.      The Debtors offered unsecured loans up to $35,000 with interest rates between 19% and 95%+, having a twelve to sixty-month term.

3

**B. Argon Credit's Equity Structure and "Loans" From Defendants**

14.    Argon Credit originally had three members: Noax, LLC, BMoney Holdings, LLC, and Gary Zumski.

15.    Through a series of subsequent transactions, Argon Credit expanded its members to include the Defendants who, as of December 16, 2016, held approximately 33.56% of the membership interests in Argon Credit.

    i.    <u>Margon Promissory Notes, Subscription Agreements, and Transfers</u>

16.    Margon is an investor in Argon Credit and in 2014 it executed two sets of subscription agreements and promissory notes.

*a. First Margon Note and Subscription Agreement*

17.    On or about September 8, 2014, Margon and Argon Credit executed the Argon Credit, LLC 20% APR Two Year Revolving Line of Credit Promissory Note (the "*First Margon Note*") pursuant to which Margon purportedly loaned Argon Credit $250,000 with a commitment to loan up to $750,000 (the "*First Margon Loan*").

18.    The parties also executed a security agreement which purported to grant Margon a security interest in Argon Credit and Argon X's accounts receivable and receivables.

19.    Contemporaneously with the First Margon Note, Argon Credit and Margon executed a subscription agreement (the "*First Margon Subscription Agreement*") pursuant to which Margon acquired 200,000 Class A Units of Argon Credit, which equaled 20% of Argon Credit's outstanding voting interests, at a price of $3.75 per unit.  A true and correct copy of the First Margon Note and First Margon Subscription Agreement are attached hereto as <u>Group Exhibit 1</u>.

20.    Margon made no payments to Argon Credit as consideration for the First Margon Subscription Agreement other than the First Margon Loan.

21.    The First Margon Note and First Margon Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

22.    On or about September 8, 2014, Argon Credit entered into the First Amended and Restated Limited Liability Company Operating Agreement (the "*First Amended Operating Agreement*") which added Margon as a member of Argon Credit and granted Margon three managers on Argon Credit's seven-member board of managers.

23.    Pursuant to the First Amended Operating Agreement, one of Margon's manager designees, Joseph Canfora, was appointed as the chair of the board of managers.

24.    Mark Triffler was also appointed as one of Margon's designees on Argon Credit's board of managers.

25.    Margon ultimately funded $365,000 of the First Margon Loan by making the following transfers to Argon Credit:

| Date | Amount |
|---|---|
| 10/7/2014 | $115,000.00 |
| 10/15/2014 | $134,000.00 |
| 10/15/2014 | $116,000.00 |

26.    On or about May 1, 2015, Margon, Fintech Financial LLC ("*Fintech*"), the Debtors, and certain of Argon Credit's subsidiaries executed a subordination agreement which subordinated the debt and security interests of Margon to those of Fintech, the predecessor-in-interest to Fund Recovery Services, LLC ("*FRS*").

### b. *Second Margon Note and Subscription Agreement*

27.     On November 6, 2014, Margon and Argon Credit executed the Argon Credit, LLC 15% APR Three Year Revolving Line of Credit Promissory Note (the "*Second Margon Note*" together with the First Margon Note, the "*Margon Notes*") pursuant to which Margon purportedly loaned Argon Credit an additional $250,000 with a commitment to loan up to $1 million (the "*Second Margon Loan*" together with the First Margon Loan, the "*Margon Loans*").

28.     The parties also executed an amended security agreement purporting to grant Margon a security interest in Argon Credit and Argon X's accounts receivable and receivables.

29.     Contemporaneously with the Second Margon Note, Argon Credit and Margon executed a second subscription agreement (the "*Second Margon Subscription Agreement*, together with the First Margon Subscription Agreement, the "*Margon Subscription Agreements*") pursuant to which Margon acquired 100,000 Class A Units of Argon Credit, which equaled 10% of Argon Credit's outstanding voting interests, at a price of $10.00 per unit.  A true and correct copy of the Second Margon Note and Second Margon Subscription Agreement are attached hereto as Group Exhibit 2.

30.     Margon made no payments to Argon Credit as consideration for the Second Margon Subscription Agreement other than the Second Margon Loan.

31.     The Second Margon Note and Second Margon Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

32.     On or about November 6, 2014, the members of Argon Credit entered into the Second Amended and Restated Limited Liability Company Operating Agreement, which adjusted Margon's increased equity ownership of Argon Credit to reflect a total of 30% of the membership interests.

33.    Margon ultimately funded $1 million of the Second Margon Loan by making the following transfers to Argon Credit:

| Date | Amount |
|---|---|
| 11/10/2014 | $100,000.00 |
| 11/10/2014 | $45,000.00 |
| 11/10/2014 | $105,000.00 |
| 11/24/2014 | $45,000.00 |
| 11/25/2014 | $205,000.00 |
| 12/11/2014 | $45,000.00 |
| 12/15/2014 | $105,000.00 |
| 12/29/2014 | $45,000.00 |
| 1/5/2015 | $205,000.00 |
| 1/28/2015 | $42,000.00 |
| 1/29/2015 | $40,000.00 |
| 1/29/2015 | $18,000.00 |

34.    On February 8, 2016, Margon, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into an amended and restated subordination agreement pursuant to which Margon's debt and security interests were subordinated to those of Fintech.

35.    As of Argon Credit's bankruptcy filing, Margon held 30% of the membership interests in Argon Credit.

*c. Transfers to Margon*

36.    Ultimately, Margon funded approximately $1.365 million of the Margon Loans.

37.    Between February 2015 and June 2016, Margon received at least $1,023,611.12 (the "*Margon Transfers*") in transfers from Argon Credit, including at least $197,416.68 (the "*Margon Preference Period Transfers*") in the year prior to the bankruptcy filing.  A list of the Margon Transfers is attached hereto and incorporated herein as Exhibit 3.

38.    The Margon Transfers were not consistent with the schedule of purported interest payments due to Margon under the Margon Notes, however.

7

39.    Specifically, the First Margon Note called for quarterly interest payments at an annual percentage rate of 20% of the then-outstanding principal and the Second Margon Note called for quarterly interest payments as an annual percentage rate of 15% of the then-outstanding principal.

40.    Based on Argon Credit's books and records and the amount and timing of the Margon Transfers set forth in Exhibit 3, Margon was overpaid on purported interest payments by approximately $588,000.

41.    For example, Argon Credit's books and records reflect that Margon only funded $365,000 of the First Margon Loan but on February 6, 2015, Argon Credit transferred $300,000 to Margon supposedly on account of the First Margon Loan.

42.    This amount far exceeded any interest payment then due and owing to Margon and substantially reduced the principal amount of the First Margon Loan.

43.    In total, Argon Credit paid Margon at least $500,000 on account of the First Margon Loan despite the fact that only approximately $120,904.11 in interest payments were due and owing under the First Margon Note during that same time period.

44.    As to the Second Margon Loan, Argon Credit's books and records reflect that Argon Credit paid Margon at least $417,611.12 despite the fact that only $208,208.55 in interest payments were due and owing under the Second Margon Note during that same time period.

45.    Argon Credit did not make any quarterly payments to Margon for the third or fourth quarter of 2016 as was required by the Margon Notes.

46.    On May 30, 2017, Margon filed a proof of claim against Argon Credit asserting a claim in the amount of $2,059,694.44 of which it claimed $497,750 as secured and the remaining $1,561,944.44 as unsecured.

8

    ii.   <u>Little Owl Promissory Note, Subscription Agreement, and Transfers</u>

47.    Little Owl is also an investor in Argon Credit and in 2015 and 2016 it also executed two sets of subscription agreements and promissory notes.

*a. First Little Owl Note and Subscription Agreement*

48.    On or about February 3, 2015, Little Owl and Argon Credit executed the Argon Credit, LLC-Little Owl Argon 18% APR Three Year Promissory Note (the "*First Little Owl Note*") pursuant to which Little Owl purportedly loaned Argon Credit $3 million (the "*First Little Owl Loan*").

49.    Contemporaneously therewith, Argon Credit and Little Owl executed a subscription agreement (the "*First Little Owl Subscription Agreement*") pursuant to which Little Owl acquired 90,322 Class A Units of Argon Credit, which equaled 8% of Argon Credit's outstanding voting interests.  A true and correct copy of the First Little Owl Note and First Little Owl Subscription Agreement is attached hereto as <u>Group Exhibit 4</u>.

50.    Little Owl made no payments to Argon Credit as consideration for the First Little Owl Subscription Agreement other than the First Little Owl Loan.

51.    The First Little Owl Note and First Little Owl Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

52.    On or about February 3, 2015, Argon Credit entered into the Third Amended and Restated Limited Liability Company Operating Agreement (the "*Third Amended Operating Agreement*") which added Little Owl as a member of Argon Credit.

53.    The Third Amended Operating Agreement also granted Little Owl one of the seven positions on Argon Credit's board of managers and reduced Margon's board designees to

two.  Joseph Canfora, one of Margon's designated managers, retained his position as chairman of the board.

54.     Little Owl transferred $3 million to Argon Credit on February 3, 2015.

55.     On or about May 1, 2015, Little Owl, Fintech, the Debtors, and certain of Argon Credit's subsidiaries executed a subordination agreement which subordinated the debt of Little Owl to that of Fintech.

### b. Second Little Owl Note and Subscription Agreement

56.     On February 6, 2016, Little Owl and Argon Credit executed the Argon Credit, LLC-Little Owl Argon, LLC Promissory Note (the "*Second Little Owl Note*" together with the First Little Owl Note, the "*Little Owl Notes*") pursuant to which Little Owl purportedly loaned Argon Credit an additional $4 million (the "*Second Little Owl Loan*").

57.     Contemporaneously therewith, Argon Credit and Little Owl executed a second subscription agreement (the "*Second Little Owl Subscription Agreement*, together with the First Little Owl Subscription Agreement, the "*Little Owl Subscription Agreements*") pursuant to which Little Owl acquired 80,299 Class A Units of Argon Credit, which equaled 7.11% of Argon Credit's outstanding voting interests.  A true and correct copy of the Second Little Owl Note and Second Little Owl Subscription Agreement is attached hereto as <u>Group Exhibit 5</u>.

58.     Little Owl made no payments to Argon Credit as consideration for the Second Little Owl Subscription Agreement other than the Second Little Owl Loan.

59.     The Second Little Owl Note and Second Little Owl Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

60.     On February 8, 2016, Little Owl, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into an amended and restated subordination agreement pursuant to which Little Owl's debt was subordinated to that of Fintech.

61.     On or about February 12, 2016, the members of Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement (the "*Fourth Amended Operating Agreement*"), which adjusted Little Owl's increased equity ownership of Argon Credit to reflect a total of 15.11% of the membership interests.

62.     The Fourth Amended Operating Agreement also expanded Argon Credit's board of managers to nine members and granted Little Owl three of the nine seats.

63.     Little Owl transferred $4 million to Argon Credit on or about February 12, 2016.

64.     As of Argon Credit's bankruptcy filing on December 16, 2016, Little Owl held 15.11% of the membership interests in Argon Credit.

### c. Little Owl Bridge Loan

65.     Little Owl further contends that it loaned an additional $2.65 million (the "*Bridge Loan*" together with the First Little Owl Loan and Second Little Owl Loan, the "*Little Owl Loans*") to Argon Credit between July 2016 and November 2016.

66.     However, Little Owl cannot locate an executed promissory note evidencing the purported Bridge Loan.

67.     Little Owl also did not identify any terms of the purported Bridge Loan, such as an interest rate, repayment terms, or maturity date.

### d. Transfers to Little Owl

68.     Between May 2015 and May 2016, Little Owl received at least $847,595.63 (the "*Little Owl Transfers*") in transfers from Argon Credit, including at least $447,759.56 (the "*Little*

*Owl Preference Period Transfers*") in the year prior to the bankruptcy filing. A list of the Little Owl Transfers is attached hereto and incorporated herein as Exhibit 6.

69.     Based on Argon Credit's books and records, Argon Credit underpaid the purported quarterly interest payments due to Little Owl by nearly $37,000 on account of the Little Owl loans through the second quarter of 2016 and did not make any quarterly payments to Little Owl for the third or fourth quarters of 2016 as required by the Little Owl Notes.

70.     On May 25, 2017, Little Owl filed a proof of claim against Argon Credit asserting an unsecured claim in the amount of $10,481,092.89.

iii.     Cardinal Trust Promissory Note, Subscription Agreement, and Transfers

71.     On or about February 6, 2016, Cardinal Trust and Argon Credit executed the Argon Credit, LLC-Cardinal Trust Promissory Note (the "*Cardinal Trust Note*") pursuant to which Cardinal Trust purportedly loaned Argon Credit $1 million (the "*Cardinal Trust Loan*").

72.     Contemporaneously therewith, Argon Credit and Cardinal Trust executed a subscription agreement (the "*Cardinal Trust Subscription Agreement*") pursuant to which Cardinal Trust acquired 20,073 Class A Units of Argon Credit, which equaled 1.78% of Argon Credit's outstanding voting interests. A true and correct copy of the Cardinal Trust Note and Cardinal Trust Subscription Agreement is attached hereto as Group Exhibit 7.

73.     Cardinal Trust made no payments to Argon Credit as consideration for the Cardinal Trust Subscription Agreement other than the Cardinal Trust Loan.

74.     The Cardinal Trust Note and Cardinal Trust Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

12

75.    On or about February 12, 2016, Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement which added Cardinal Trust as a member of Argon Credit.

76.    Cardinal Trust transferred $500,000 to Argon Credit on November 9, 2015 and an additional $500,000 to Argon Credit on February 12, 2016.

77.    Thus, Cardinal Trust funded half of the balance of the Cardinal Trust Loan nearly three months prior to executing the Cardinal Trust Note.

78.    On or about February 8, 2016, Cardinal Trust, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into a subordination agreement which subordinated the debt of Cardinal Trust to that of Fintech.

79.    Between February 2016 and May 2016, Cardinal Trust received at least $94,444.44 (the "*Cardinal Trust Transfers*") in transfers from Argon Credit.   A list of the Cardinal Trust Transfers is attached hereto and incorporated herein as Exhibit 8.

80.    Based on Argon Credit's books and records, Argon Credit overpaid the purported quarterly interest payments due to Cardinal Trust by more than $27,000 through the second quarter of 2016 and did not make any quarterly payments to Cardinal Trust for the third or fourth quarters of 2016 as required by the Cardinal Trust Note.

81.    On May 30, 2017, Cardinal Trust filed a proof of claim against Argon Credit asserting a general unsecured claim in the amount of $1,124,444.44.

   iv.    Triffler Trust Promissory Note, Subscription Agreement, and Transfers

82.    On or about February 6, 2016, Triffler Trust and Argon Credit executed the Argon Credit, LLC-Mark Triffler Declaration of Trust Dated December 5, 1991 Promissory Note (the "*Truffler Trust Note*" together with the Margon Notes, Little Owl Notes, and Cardinal Trust

Note, the "*Notes*") pursuant to which Triffler Trust purportedly loaned Argon Credit $1 million (the "*Triffler Trust Loan*" together with the Margon Loans, Little Owl Loans, and Cardinal Trust Loan, the "*Loans*").

83.     Contemporaneously therewith, Argon Credit and Triffler Trust executed a subscription agreement (the "*Triffler Trust Subscription Agreement*" together with the Margon Subscription Agreements, Little Owl Subscription Agreements, and Cardinal Trust Subscription Agreement, the "*Subscription Agreements*") pursuant to which Triffler Trust acquired 20,073 Class A Units of Argon Credit, which equaled 1.78% of Argon Credit's outstanding voting interests.  A true and correct copy of the Triffler Trust Note and Triffler Trust Subscription Agreement is attached hereto as <u>Group Exhibit 9</u>.

84.     Triffler Trust made no payments to Argon Credit as consideration for the Triffler Trust Subscription Agreement other than the Triffler Trust Loan.

85.     The Triffler Trust Note and Triffler Trust Subscription Agreement provide that they are governed in accordance with the laws of the State of Illinois.

86.     On or about February 12, 2016, Argon Credit entered into the Fourth Amended and Restated Limited Liability Company Operating Agreement which added Triffler Trust as a member of Argon Credit.

87.     Triffler Trust transferred $500,000 to Argon Credit on November 9, 2015 and an additional $500,000 to Argon Credit on February 6, 2016.

88.     Thus, Triffler Trust funded half of the balance of the Triffler Trust Loan nearly three months prior to executing the Triffler Trust Note.

89.     On or about February 8, 2016, Triffler Trust, Fintech, the Debtors, and certain of Argon Credit's subsidiaries entered into a subordination agreement which subordinated the debt of Triffler Trust to that of Fintech.

90.     Between February 2016 and May 2016, Triffler Trust received at least $74,722.22 (the "*Triffler Trust Transfers*" together with the Margon Transfers, Little Owl Transfers, and Cardinal Trust Transfers, the "*Challenged Transfers*") in transfers from Argon Credit.  A list of the Triffler Trust Transfers is attached hereto and incorporated herein as Exhibit 10.

91.     Argon Credit overpaid the purported quarterly interest payments due to Triffler Trust by approximately $1,000 through the second quarter of 2016 and did not make any quarterly payments to Triffler Trust for the third or fourth quarters of 2016 as required by the Triffler Trust Note.

92.     On May 30, 2017, Triffler Trust filed a proof of claim against Argon Credit asserting a general unsecured claim in the amount of $1,124,444.44.

**C. Argon Credit's Financial Condition**

93.     Argon Credit's books and records reflect that it was insolvent at the time of each of the Challenged Transfers.

94.     Argon Credit's tax return for the calendar year ending December 31, 2014 states that it had total operating income of only $136,834, yet it took on $365,000 in purported debt to Margon under the First Margon Loan during that same time period.

95.     Argon Credit's internal balance sheet reflects that as of January 31, 2015, Argon Credit's assets totaled $2,099,819.62 and its liabilities totaled $2,108,460.65, resulting in negative $8,641.03 in equity.

96.    From that point forward, Argon Credit's financial condition deteriorated each month that it continued to operate and its negative equity balance increased each month.

97.    An independent accountant's review of Argon Credit's finances reflected that as of December 31, 2015, Argon Credit had negative equity of $11,285,946.

98.    That same accountant's review stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708 for the year ended December 31, 2015.

99.    As of November 30, 2016, Argon Credit's internal balance sheet reflects assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative equity of $7,162,685.51.

**D.  Debtors' Bankruptcy Filings**

100.    On December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

101.    On January 11, 2017, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7.

102.    The Trustee was appointed as interim chapter 7 trustee on April 17, 2017 and confirmed by the Court on July 6, 2017.

## COUNT I

**(Recharacterization of Defendants' Loans as Equity Pursuant to
28 U.S.C. § 2201, Sections 105(a), 502(b) and 502(j) of the Bankruptcy Code)**

103.    The Trustee repeats, realleges, and incorporates paragraphs 1 through 102 of the Complaint as if fully set forth herein.

104.    Where a debt instrument carries certain indicia of an equity contribution, this Court may recharacterize such debt instrument as equity pursuant to section 502(b) of the

Bankruptcy Code, provided that such claim may be recharacterized "under any applicable law." 11 U.S.C. § 502(b).

105.    By agreement of the parties and operation of law, Illinois law governs the Notes and Subscription Agreements.

106.    Illinois and federal bankruptcy law both recognize a cause of action for recharacterization. Accordingly, the Court has the authority to recharacterize the Defendants' debts against Argon Credit to equity under sections 105(a) and 502(b) and 28 U.S.C. § 2201 and Illinois law.

107.    Additionally, under section 502(j) of the Bankruptcy Code, a claim that has been allowed may be reconsidered for cause, according to the equities of the case. This section provides further support for the recharacterization of a previously allowed claim as equity.

108.    In evaluating whether a debt instrument should be recharacterized as equity, courts consider the following non-exclusive factors:

i.    the names given to the instruments, if any, evidencing indebtedness;
ii.    the presence or absence of a fixed maturity date and schedule of payments;
iii.    the presence or absence of a fixed rate of interest and interest payments;
iv.    the source of repayments;
v.    the adequacy or inadequacy of capitalization;
vi.    the identity of interest between the creditor and the stockholder;
vii.    the security, if any, for the advances;
viii.    the corporation's ability to obtain financing from outside lending institutions;
ix.    the extent to which the advances were subordinated to the claims of outside creditors;
x.    the extent to which the advances were used to acquire capital assets;
xi.    the presence or absence of a sinking fund to provide repayments;
xii.    the ratio of shareholder loans to capital;
xiii.    the amount or degree of shareholder control;
xiv.    the right to enforce payment of principal and interest;
xv.    participation in management flowing as a result of the transaction;
xvi.    the intent of the parties; and
xvii.    the failure of the debtor to repay the obligation on the due date or to seek postponement.

109.   The foregoing factors are not exhaustive, and courts have found that a recharacterization analysis is inherently fact-specific.

110.   In the present case, based upon the Trustee's investigation, the purported Loans made to Argon Credit by the Defendants carry numerous indicia of equity, which suggests that they should be recharacterized.  At a minimum, the following indicia support this relief:

    i.    Defendants received membership interests in Argon Credit commensurate with the amount of their purported Loans for no additional consideration;

    ii.    Upon executing the Notes and Subscription Agreements, Argon Credit's operating agreements were immediately amended to reflect the Defendants' new equity ownership interests;

    iii.    Margon and Little Owl were granted the right to place their own designees on Argon Credit's board of members;

    iv.    The parties did not comply with the schedule of interest payments purportedly due to Defendants under the Notes, especially as to Margon and Little Owl;

    v.    Argon Credit was insolvent or otherwise lacked adequate capitalization at the time of each of the Loans, including at the time of the First Margon Loan in 2014 when it had total operating income of $136,834;

    vi.    Each of the Loans were subordinated to Fintech and Defendants' ability to enforce payments of principal and interest was effectively blocked by the subordination agreements;

    vii.    The Margon Loans were made to Argon Credit at its inception, before Argon Credit had commenced substantial business operations;

    viii.    Margon and Little Owl were already insiders at the time of the Second Margon Loan and Second Little Owl Loan;

    ix.    Mark Triffler was already a member of Argon Credit's board of managers at the time of the Triffler Trust Loan; and

    x.    On information and belief, Argon Credit was unable to obtain financing from outside lending institutions at the time of the Loans; and

xi.   Upon information and belief, the Defendants' intent was for the Loans to disguise their purchases of equity in Argon Credit.

111.   Pursuant to 28 U.S.C. § 2201, this Court is authorized to declare the rights and other legal relations of the Trustee and the Defendants with respect to the enforceability and nature of the Notes and Loans.  The Trustee requests a declaration that the Notes and Loans bear significant indicia of equity contributions and should be recharacterized as such.

112.   For the foregoing reasons, the Loans should be recharacterized as equity infusions, and any payments made to the Defendants on account thereof should be disgorged to Argon Credit's estate and any liens granted in favor of Margon on Argon Credit's assets should be declared null and void.

## COUNT II

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. §548(a)(1)(B))

113.   The Trustee repeats and re-alleges the allegations of paragraphs 1 through 112 as though fully set forth herein.

114.   Each of the Challenged Transfers to Defendants constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

115.   Each Challenged Transfer was made within the two years prior to the Petition Date.

116.   The Loans were disguised equity contributions or consideration for the purchase of equity interests in Argon Credit.

117.   The Loans should be recharacterized as contributions of equity in Argon Credit.

118.    Because the Loans should be recharacterized as equity contributions, the Challenged Transfers were actually member distributions and not made on account of an antecedent debt owed by Argon Credit and Argon Credit did not receive reasonably equivalent value in exchange for the Challenged Transfers.

119.    Argon Credit's liabilities exceeded its assets at the time of each of the Challenged Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

120.    Accordingly, on the date each Challenged Transfer was made, Argon Credit:

    i.    was insolvent or became insolvent as a result of the Challenged Transfer;

    ii.   was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

    iii.  intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

121.    For these reasons, the Trustee may avoid the Challenged Transfers as fraudulent under 11 U.S.C. § 548(a)(1)(B).

### COUNT III

**(Recovery of Challenged Transfers Pursuant to 6 Del. C. § 18-607)**

122.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 121 as though fully set forth herein.

123.    Argon Credit is a limited liability company organized under the laws of the State of Delaware.

124.    The Delaware Limited Liability Company Act provides, in relevant part:

> (a) A limited liability company shall not make a distribution to a member to the extent that at the time of the distribution, after giving effect to the distribution, all liabilities of the limited liability company . . . exceed the fair value of the assets of the limited liability company . . . .
>
> (b) A member who receives a distribution in violation of subsection (a) of this section, and who knew at the time of the distribution that the distribution violated subsection (a) of this section, shall be liable to a limited liability company for the amount of the distribution.

6 Del. C. § 18-607.

125.    At the time of each of the Challenged Transfers, Argon Credit's liabilities exceeded the fair value of its assets after giving effect to the Challenged Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

126.    On information and belief, each of the Defendants knew at the time of the Challenged Transfers that Argon Credit's liabilities exceeded the fair value of its assets because the Defendants regularly received copies of Argon Credit's financial reports.

127.    Accordingly, to the extent that this Court recharacterizes the Loans as equity contributions, the Defendants received the Challenged Transfers in violation of 6 Del. C. § 18-607(a) and the Defendants are liable to Argon Credit's estate for the amount of the Challenged Transfers.

128.    By reason of the foregoing, the Trustee seeks entry of judgment in his favor and against the Defendants pursuant to 6 Del. C. §§ 18-607(a) and (b) in the amount of the Challenged Transfers as applicable to each Defendant.

## COUNT IV

**(In the Alternative, Avoidance of Preference Period Transfers Pursuant to 11 U.S.C. § 547)**

129.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 102 as though fully set forth herein.

130.   During the one year period prior to the Petition Date (the "*Preference Period*"), Argon Credit made the Margon Preference Period Transfers, Little Owl Preference Period Transfers, Cardinal Trust Transfers, and Triffler Trust Transfers (collectively, the "*Preference Period Transfers*") to the Defendants.

131.   To the extent that the Court does not recharacterize the Loans as equity, the Defendants were creditors, within the meaning of section 101(10)(A) of the Bankruptcy Code, of Argon Credit at the time of each of the Preference Period Transfers.

132.   Each Preference Period Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

133.   Each of the Preference Period Transfers was a transfer to, or for the benefit of, the Defendants because each Preference Period Transfer either reduced or fully satisfied a debt then owed by Argon Credit to the Defendants on account of the Loans.

134.   Each Preference Period Transfer was made for, or on account of, an antecedent debt owed by Argon Credit to the Defendants before such Preference Period Transfers were made.

135.   Based on Argon Credit's books and records and negative equity balance since at least January 31, 2015, each Preference Period Transfer was made while Argon Credit was insolvent.

136.   Each of the Defendants was an insider of Argon Credit at the time of the Preference Period Transfers because, among other things, they or their designees were members of Argon Credit's board of managers and each of the Defendants were persons in control of Argon Credit because they had the ability to direct or approve Argon Credit's business transactions and policies.

137.    Each Preference Period Transfer was made on or within one year prior to the Petition Date.

138.    Each Preference Period Transfer enabled the Defendants to receive more than they would receive if:

      i.    Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

      ii.    such Preference Period Transfer had not been made; and

      iii.    the Defendants received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

139.    By reason of the foregoing, the Trustee may avoid the Preference Period Transfers as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

## COUNT V

**(In the Alternative, Avoidance of Transfers Pursuant to
11 U.S.C. § 544(b)(1) and 28 U.S.C. § 3304)**

140.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 102 as though fully set forth herein.

141.    During the two years period prior to the Petition Date (the "*Two Year Reach Back Period*"), Argon Credit made the Challenged Transfers to the Defendants.

142.    To the extent that the Court does not recharacterize the Loans as equity, the Defendants were creditors, within the meaning of section 101(10)(A) of the Bankruptcy Code, of Argon Credit at the time of each of the Challenged Transfers.

143.    At the time the Challenged Transfers were made through the Petition Date, the Internal Revenue Service (the "*IRS*") was a creditor of Argon Credit.

144.    The IRS filed a proof of claim against Argon Credit for non-payment of federal taxes in the total amount of $867,595.72, including taxes owed as far back as 2014.

145.    The IRS was, or would have been, a creditor holding an allowable unsecured claim against Argon Credit that would have a right under applicable nonbankruptcy law to avoid the Challenged Transfers.

146.    The Challenged Transfers are avoidable pursuant to 11 U.S.C. § 544(b)(1) and 28 U.S.C. § 3304(a)(2).

147.    Pursuant to 11 U.S.C. § 544(b)(1), the Trustee may stand in the place of the IRS with respect to claims under 28 U.S.C. § 3304(a)(2)

148.    The Challenged Transfers were made to insiders because the Defendants or their designees were members of Argon Credit's board of managers and/or each of the Defendants were persons in control of Argon Credit because they had the ability to direct or approve Argon Credit's business transactions and policies.

149.    To the extent that the Court does not recharacterize the Loans as equity, each Challenged Transfer was made for, or on account of, an antecedent debt owed by Argon Credit to the Defendants before such Challenged Transfers were made.

150.    The Challenged Transfers were made while Argon Credit was insolvent because Argon Credit's liabilities exceeded the fair value of its assets after giving effect to the Challenged Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

151.    The Defendants had reasonable cause to believe that Argon Credit was insolvent at the time of the Challenged Transfers because the Defendants or their designees were members of the board of managers and Defendants regularly received copies of Argon Credit's financial reports.

152.   Accordingly, to the extent that the Court does not recharacterize the Loans as equity, the Challenged Transfer are avoidable pursuant to section 544 of the Bankruptcy Code and 28 U.S.C. § 3304.

## COUNT VI

**(Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550)**

153.   The Trustee repeats and re-alleges the allegations of paragraphs 1 through 152 as though fully set forth herein.

154.   The Defendants were either: (a) the initial transferee of the Challenged Transfers and Preference Period Transfers, (b) the entity for whose benefit the Challenged Transfers and Preference Period Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

155.   To the extent that the Challenged Transfers or Preference Period Transfers are avoided pursuant to sections 544, 547 or 548 of the Bankruptcy Code, the Trustee may recover the Challenged Transfers, Preference Period Transfers, or their value, from the applicable Defendants or any mediate or immediate transferee pursuant to section 550 of the Bankruptcy Code.

156.   By reason of the foregoing, the Trustee may recover the Challenged Transfers, Preference Period Transfers, or the value thereof from the applicable Defendants pursuant to section 550 of the Bankruptcy Code.

## COUNT VII

### (Disallowance of Claims Pursuant to 11 U.S.C. § 502(d))

157.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 157 as though fully set forth herein.

158.    Section 502(d) of the Bankruptcy Code provides, in relevant part, that the claim of any entity or transferee receiving a payment that is avoidable under sections 544, 547 or 548 of the Bankruptcy Code shall be disallowed unless the entity or transferee turns over the payment or value of the payment.

159.    The Defendants are the transferee of the Challenged Transfers and Preference Period Transfers.

160.    The Defendants have each filed proofs of claim against Argon Credit's bankruptcy estate.

161.    The Defendants have neither paid nor surrendered the Challenged Transfers, Preference Period Transfers, or the value therefor to Argon Credit's estate.

162.    The Trustee objects to any and all claims of the Defendants, including without limitation, all pre-petition and post-petition claims pursuant to section 502(d) of the Bankruptcy Code.

163.    By reason of the foregoing, any claim which the Defendants have filed must be disallowed pursuant to section 502(d) of the Bankruptcy Code until the Challenged Transfers, Preference Period Transfers, or the value thereof are returned to the Argon Credit's estate.

WHEREFORE, the Trustee requests the entry of a judgment against the Defendants granting the following relief:

(a) As to Count I, recharacterizing the Defendants' Loans to Argon Credit as equity

26

contributions pursuant to 28 U.S.C. § 2201 and 11 U.S.C. §§ 105(a), 502(b) and 502(j);

(b) As to Count II, avoiding the Challenged Transfers to the Defendants pursuant to section 548 of the Bankruptcy Code as follows: (i) as to Margon, in an amount not less than $1,023,611.12, (ii) as to Little owl, in an amount not less than $847,595.63, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(c) As to Count III, in favor of the Trustee and against the Defendants for violation of 6 Del. C. § 18-607 as follows: (i) as to Margon, in an amount not less than $1,023,611.12, (ii) as to Little Owl, in an amount not less than $847,595.63, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(d) As to Count IV, to the extent the Court does not grant judgment in favor of the Trustee on Counts I-III, avoiding the Preference Period Transfers pursuant to section 547 of the Bankruptcy Code as follows: (i) as to Margon, in an amount not less than $197,416.68, (ii) as to Little Owl, in an amount not less than $447,759.56, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(e) As to Count V, to the extent the Court does not grant judgment in favor of the Trustee on Counts I-III, avoiding the Challenged Transfers to the Defendants pursuant to section 544 of the Bankruptcy Code and 28 U.S.C. §3304 as follows: (i) as to Margon, in an amount not less than $1,023,611.12, (ii) as to Little owl, in an amount not less than $847,595.63, (iii) as to Cardinal Trust, in an amount not less than $99,444.44, and (iv) as to Triffler Trust, in an amount not less than $74,722.22;

(f) As to Count VI, ordering the Defendants to return the Challenged Transfers or Preference Period Transfers, as applicable, or their value to the Argon Credit's estate

pursuant to section 550 of the Bankruptcy Code;

(g) As to Count VII, disallowing any claims of the Defendants pursuant to section 502(d) of the Bankruptcy Code unless and until the amount of the Challenged Transfers, Preference Period Transfers, or their value, as applicable, are returned to Argon Credit's estate;

(h) As to all Counts, the Court award the Trustee pre-judgment interest at the legally allowable rate;

(i) As to all Counts, the Court assess all fees and costs of this action against the Defendants; and

(j) Such other and further relief as is just and proper.

Dated: December 14, 2018                    **EUGENE CRANE, CHAPTER 7 TRUSTEE**

By: /s/ Shelly A. DeRousse
     One of His Attorneys

Shelly A. DeRousse, Esq.
Elizabeth L. Janczak, Esq.
Freeborn & Peters LLP
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
Telephone:  312.360.6000
Facsimile:   312.360.6520
sderousse@freeborn.com
ejanczak@freeborn.com