## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| IN RE:<br><br>ARGON CREDIT, LLC, *et al.*,<br><br>Debtors. | ) ) ) ) ) ) ) | Case No. 16-39654<br>(Jointly Administered)<br><br>Chapter 7<br><br>Hon. Deborah L. Thorne |
| EUGENE CRANE, the duly appointed and serving Chapter 7 Trustee for the estates of Argon Credit, LLC and Argon X, LLC,<br><br>            Plaintiff,<br><br>v.<br><br>RAVIV WOLFE, GARY ZUMSKI, PETER FERRO, JR., BERJ ARAKELIAN, ERIC SCHNOSENBERG, SEAN TOMASZKIEWICZ, HARRY MADANYAN, JOSEPH CANFORA, MARK TRIFFLER, JOHN A. KUHLMAN, JR., BRUCE BREITWEISER, BYRON FAEMARK, BARRY KOSTINER, BERGARVIV, LLC, BROADMARK CAPITAL, LLC, PERAZA CAPITAL AND INVESTMENT, LLC, and BLUE TREBLE SOLUTIONS, LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 18-ap-_____ |

Defendants.

## COMPLAINT

Eugene Crane, the chapter 7 trustee (the "*Trustee*") for the estates of Argon Credit, LLC ("*Argon Credit*") and Argon X, LLC ("*Argon X*," together with Argon Credit, the "*Debtors*"), by and through his undersigned counsel, files this complaint (the "*Complaint*") against Raviv Wolfe, Gary Zumski, Peter Ferro, Jr., Berj Arakelian, Eric Schnosenberg, Sean Tomaszkiewicz, Harry Madanyan, Joseph Canfora, Mark Triffler, John A. Kuhlman, Jr., Bruce Breitweiser, Byron Faemark, Bergarviv, LLC, Broadmark Capital, LLC, Peraza Capital and Investment, LLC, and Blue Treble Solutions, LLC (collectively, the "*Defendants*"). By this Complaint, the

Trustee seeks entry of a judgment: (i) against the Individual Defendants (defined below) for breach of their fiduciary duties of loyalty and care; (ii) avoiding and recovering certain transfers made by Argon Credit to certain of the Transferee Defendants (defined below) as preferences and/or fraudulent transfers; and (iii) disallowing any claims of the Transferee Defendants.  The Trustee states as follows as to all matters:

## NATURE OF THIS ACTION

1.      During the course of the Debtors' limited business operations spanning approximately two years, Argon Credit's officers and members of its board of managers repeatedly breached their fiduciary duties of loyalty and care to the Debtors and to the Debtors' creditors by: (i) scheming to funnel assets away from the Debtors and their creditors, (ii) transferring assets to insiders; (iii) double-pledging assets to the Debtors' secured lender and an insider's lender; (iv) knowingly submitting false or misleading financial information to the Debtors' secured lender, including a false accounts receivable report; (v) paying themselves exorbitant "commissions" without disclosure to or approval of the Debtors' board of managers, (vi) using company funds to pay for personal expenses unrelated to the Debtors' business operations, and (vii) authorizing the Debtors to enter into purported loans with investors which were really contributions of equity and authorizing equity distributions to those investors at a time when the Debtors were insolvent.

2.      All of these actions contributed to the Debtors' inability to meet their financial obligations which ultimately led to the Debtors' secured lender declaring a default under the applicable loan documents and caused the Debtors to file for bankruptcy.  The Trustee was appointed to liquidate the Debtors' remaining assets and pursue claims on behalf of the Debtors

and their creditors.  The Trustee files this action to recover damages in excess of $6 million that resulted from the bad acts described below.

## PARTIES

3.      The Trustee is the duly appointed chapter 7 trustee of the Debtors' bankruptcy estates.

4.      Raviv Wolfe ("*Wolfe*") is an individual who, on information and belief, resides in Valparaiso, Indiana.  Wolfe was Argon Credit's chief executive officer and a member of Argon Credit's board of managers at all times relevant to this Complaint.

5.      Gary Zumski ("*Zumski*") is an individual who, on information and belief, resides in Rolling Meadows, Illinois.  Zumski was Argon Credit's chief risk officer at all times relevant to this Complaint and was a member of Argon Credit's board of managers between September 8, 2014 and February 12, 2016.

6.      Peter Ferro, Jr. ("*Ferro*") is an individual who, on information and belief, resides in Minooka, Illinois.  Ferro was Argon Credit's president from June 2016 forward and, further, was a member of Argon Credit's board of managers between September 8, 2014 and February 3, 2015.

7.      Berj Arakelian ("*Arakelian*") is an individual who, on information and belief, resides in San Diego, California.  Arakelian was Argon Credit's chief executive officer from September 8, 2014 through approximately May 2015 and was a member of Argon Credit's board of managers between September 8, 2014 and February 12, 2016.

8.      Eric Schnosenberg ("*Schnosenberg*") is an individual who, on information and belief, resides in Chicago, Illinois.  Schnosenberg was Argon Credit's executive vice president of finance at all times relevant to this Complaint.

9.      Sean Tomaszkiewicz ("*Tomaszkiewicz*") is an individual who, on information and belief, resides in Naperville, Illinois.  Tomaszkiewicz was Argon Credit's vice president of technology and business development at all times relevant to this Complaint.

10.     Harry Madanyan ("*Madanyan*") is an individual who, on information and belief, resides in Palos Heights, Illinois. Madanyan was Argon Credit's interim chief operations officer and director of strategy at all times relevant to this Complaint.

11.     Joseph Canfora ("*Canfora*") is an individual who, on information and belief, resides in Chicago, Illinois.  Canfora was a member of Argon Credit's board of managers at all times relevant to this Complaint.

12.     Mark Triffler ("*Triffler*") is an individual who, on information and belief, resides in Lemont, Illinois.  Triffler was a member of Argon Credit's board of managers at all times relevant to this Complaint.

13.     John A. Kuhlman, Jr. ("*Kuhlman*") is an individual who, on information and belief, resides in Burr Ridge, Illinois.  Kuhlman was a member of Argon Credit's board of managers from February 3, 2015 forward.

14.     Bruce Breitweiser ("*Breitweiser*") is an individual who, on information and belief, resides in Bloomington, Illinois.  Breitweiser was a member of Argon Credit's board of managers from February 12, 2015 forward.

15.     Byron Faermark ("*Faermark*") is an individual who, on information and belief, resides in Elmhurst, Illinois.  Faermark was a member of Argon Credit's board of managers from February 12, 2015 forward.

16.     Barry Kostiner ("*Kostiner*") is an individual who, on information and belief, resides in Monsey, New York.

4

17.     Bergarviv LLC ("*Bergarviv*") is an Illinois limited liability company with its principal place of business located in Carpentersville, Illinois.

18.     Broadmark Capital, LLC ("*Broadmark*") is a Washington limited liability company with its principal place of business in Seattle, Washington.

19.     Peraza Capital and Investment, LLC ("*Peraza*") is a Florida limited liability company with its principal place of business in Saint Petersburg, Florida.

20.     Blue Treble Solutions, LLC ("*Blue Treble*") is a limited liability company, organized under the laws of the state of Delaware with its principal place of business in Naperville, Illinois.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over this Complaint pursuant to 28 U.S.C. § 1334. The statutory predicates for the relief requested herein are sections 105(a), 502(b), 502(d), 502(j), 547, 548, and 550 of the Bankruptcy Code.

22.     This Complaint is a core proceeding under 28 U.S.C. § 157(b)(2) and the Trustee consents to entry of a final judgment by the United States Bankruptcy Court for the Northern District of Illinois (the "*Court*").

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## BACKGROUND

### A.  The Debtors' Business Operations

24.     Argon Credit was formed as a Delaware limited liability company on October 15, 2013. Argon Credit did not begin significant business operations until late 2014.  Argon X was formed as a Delaware limited liability company on April 23, 2015.

25.     Argon Credit owns 100% of the interests in Argon X.

26.    The Debtors operated a state-by-state consumer loan origination business. Certain non-debtor affiliates executed the loans and the loans were funded and serviced by Argon Credit.  Argon X purchased the consumer loans from the affiliates and Argon Credit serviced the loans.

27.    The Debtors offered unsecured loans up to $35,000 with interest rates between 19% and 95%+, having a twelve to sixty-month term.

**B.  Princeton Credit Facility**

28.    On May 1, 2015, Argon X entered into a Loan and Security Agreement (the "*Fintech Loan Agreement*") with Fintech Financial, LLC ("*Fintech*") which provided Argon X with a revolving line of credit with a maximum loan limit of $20,000,000.  In exchange, Argon X granted Fintech a security interest in certain of its personal property.

29.    Argon Credit and certain of its subsidiaries executed a Guaranty and Suretyship Agreement (the "*Guaranty*") in favor of Fintech which, among other things, guaranteed the full, prompt, and unconditional payment when due of Argon X's liabilities and obligations under the Fintech Loan Agreement.

30.    Pursuant to the terms of the Fintech Loan Agreement and the Guaranty, the Debtors agreed to provide Fintech with financial statements and other information applicable to Argon X and other financial information reasonably requested by Fintech.

31.    On May 6, 2015, Fintech and Princeton Alternative Income Fund, LP ("*Princeton*") entered into an agreement whereby Fintech agreed to sell, assign and transfer to Princeton all of its rights, title, and interests in certain of the Debtors' loans as identified by Fintech from time to time, as well as Fintech's rights and remedies under the Loan and Security Agreement.

32.     On September 30, 2015, Argon X and Fintech entered into that certain First Amendment to Loan and Security Agreement and Modification to Other Financing Agreements (the "*First Amendment*") which, among other things, increased the maximum credit available under the Loan and Security Agreement to $34,000,000.

33.     On February 8, 2016, Argon X and Fintech entered into the Second Amendment to Loan and Security Agreement and Modification to Other Financing Agreements (the "*Second Amendment*," together with the Fintech Loan Agreement and First Amendment, the "*Fintech Loan Agreements*") which, among other things, increased the maximum credit available to Argon Credit to $37,500,000.

34.     On December 7, 2016, Princeton assigned its rights in the Fintech Loan Agreements to Fund Recovery Services, LLC.

**C.  Spartan Allegations**

35.     Just 21 days after entering the Fintech Loan Agreements, Barry Kostiner incorporated an entity with a name eerily similar to the Debtors' secured lender Fintech Financial, LLC.  The new entity was named Fintech Asset Management, LLC ("*FTAM*"). FTAM's managing member is Barry Kostiner, who also worked for Argon Credit at the time of the transaction and used an Argon Credit e-mail address for business transactions.

36.     The Debtors sought to sell certain consumer loans in their portfolio to FTAM, which would then transfer the consumer loans to other entities for the purpose of re-pledging those consumer loans to another secured lender.

37.     The Debtors did not disclose this series of transactions to their creditors.

### i.   Entities Involved in Spartan Transaction

38.   In connection with the contemplated sale, the following companies were incorporated:

1. FTAM was incorporated in Delaware on May 22, 2015. FTAM's managing member is Barry Kostiner.

2. Spartan Specialty Finance I, LLC ("*SSF*") was incorporated as a Delaware limited liability company on August 4, 2015. SSF's sole member is FTAM, which is controlled by Barry Kostiner.

3. SSF Holdings LLC ("*SSF Holdings*") was incorporated as a Delaware limited liability company on August 4, 2015. Raviv Wolfe was the managing member and chief executive officer of SSF Holdings.

4. Spartan Specialty Finance I SPV, LLC ("*SSF SPV*" together with FTAM, SSF, and SSF Holdings, "*Spartan*") was incorporated as a Delaware limited liability company on October 20, 2015. Its sole member is FTAM, which is controlled by Barry Kostiner.

### ii.   Initial Assignment and Servicing Agreements

39.   In furtherance of the contemplated transaction, the parties executed four separate agreements on or about July 29, 2015 which set forth a framework for the parties' relationship and eventual sale or assignment of consumer loans.

40.   First, Argon Credit, SSF, and FTAM executed a Servicing Agreement which provided that, among other things:

1. Argon Credit would originate and transfer certain consumer loans to SSF;

2. Argon Credit would provide pre-servicing support and administrative services in connection with the consumer loans and would also service the consumer loans, including collecting monies which would be segregated from Argon Credit's other property and then deposited into SSF's account within one business day; and

3. Argon Credit would receive a servicing fee equal to 15% of the amount invested by SSF in the consumer loans payable in equal monthly installments over 6 months. However, SSF was obligated to pay the fee to FTAM who was then obligated to pay it to Argon Credit. The Servicing

Agreement provides that Argon Credit has no right of recourse against the consumer loans for payment of the servicing fee.

41.    Wolfe signed the Servicing Agreement on behalf of Argon Credit.

42.    Second, Argon Credit, FTAM, and SSF executed a side agreement which provided that Argon Credit granted FTAM a right of allocation for up to 25% of the consumer loans originated by Argon Credit that have an annual percentage rate equal to or exceeding 40% to be assigned to FTAM on a monthly basis. Argon Credit also granted FTAM a right of first refusal to acquire such loans in the event Argon Credit proposed to sell it.

43.    SSF also executed a promissory note (the "*SSF Note*") in favor of SSF Holdings LLC in the principal amount of $330,000, which provided that the proceeds would be used to fund SSF's lending activities of originating and servicing loans. Wolfe signed the SSF Note as CEO of SSF Holdings LLC. The SSF Note called for quarterly payments to be made beginning August 2015 through February 2018 totaling $580,000 as a preferred return prior to equity payout.

44.    SSF and SSF Holdings also executed a subscription agreement pursuant to which SSF issued and sold the Promissory Note to SSF Holdings.

**iii.    Sale of the Consumer Loans to FTAM**

45.    On August 20, 2015, Argon Credit and FTAM executed a Master Loan Sale Agreement pursuant to which Argon Credit agreed to sell certain qualified loans to FTAM.

46.    Wolfe signed the Master Loan and Sale Agreement on behalf of Argon Credit.

47.    The Master Loan and Sale Agreement provided that Argon Credit would make entries on its books and records to clearly indicate the sale of certain consumer to FTAM.

48.    On information and belief, Argon Credit sold or assigned consumer loans to FTAM having a face value of at least $4,840,024.67.

49.     Upon information and belief, since the interest rates on those loans equaled or exceeded 40%, the actual value was significantly higher than the attributed face value because of the potential cash flow to be generated from interest.

50.     However, Argon Credit's books and records reflect that it only received a total of $3,768,438.70 on account of the consumer loans sold to FTAM.

51.     Argon Credit continued to service the consumer loans after they were sold to FTAM, but neither SSF nor FTAM ever paid any fees to Argon Credit in exchange for servicing the consumer loans.

52.     The consumer loans sold to FTAM were Princeton's collateral and the Debtors did not disclose the transaction to Princeton until December 2016.

53.     Argon Credit continued to reflect these consumer loans on its borrowing base certificates and other financial information submitted to Princeton.   In turn, Argon Credit continued to borrow against these phantom loans despite the fact that there was no collateral to support it.

54.     During the pendency of the Debtors' chapter 11 bankruptcy cases, this Court found that these loans were "double counted" as Princeton and SSF's collateral.

55.     The Debtors' books and records do not reflect whether the Master Loan Sale Agreement or series of transactions with Spartan were approved by Argon Credit's board of managers. In fact, none of the board books maintained by Argon Credit's board of managers includes any board meeting agendas, minutes, or resolutions between May 2015 and May 2016.

56.     On information and belief, Wolfe, Arakelian, Schnosenberg, Madanyan, Zumski, Canfora, Triffler, Ferro, Kuhlman, Breitweiser, Tomaszkiewicz, and Faermark (collectively, the "*Individual Defendants*") were each aware at the time or subsequently became aware of the

transactions with Spartan and, further, knew or should have known that the transaction was not disclosed to Princeton and was not reflected on Argon Credit's books and records.

57.     In fact, Schnosenberg, Wolfe, and Arakelian received daily reports regarding the transferred loans and monitored and participated in the transactions.

### iv.     SSF and FTAM Default on Their Loan

58.     On October 31, 2015, SSF SPV entered into a Loan and Security Agreement with Hamilton Funding I LP ("*Hamilton*"), pursuant to which Hamilton agreed to loan up to $10,000,000 to SSF SPV with a delayed draw term loan facility, secured by the assets Argon Credit transferred to SSF SPV, with a 70% loan to collateral value borrowing base (the "*Hamilton Loan*").

59.     FTAM, Kostiner, and Wolfe each guaranteed the Hamilton Loan.

60.     Argon Credit, which continued to act as servicer for the transferred loans, deposited cash proceeds of the loans on a weekly basis into a bank account owned by Spartan, which was subject to a security interest of Hamilton via a deposit account control agreement (the "*Spartan Bank Account*").   Upon information and belief, the deposits into the Spartan Bank Account were approximately $50,000 per week.

61.     Upon information and belief, in or around January 2016, SSF SPV fell into non-compliance with the terms of the Hamilton Loan.  On February 5, 2016, SSF SPV represented to Hamilton that it would use Argon Credit's assets, if necessary, to enable SSF SPV to come into compliance.

62.     On February 5, 2016, Kostiner sent an email on behalf of SSF SPV to Daniel Wirzberger, a representative of Hamilton, stating "Argon is expecting to receive $5 mm from its investors this week, which will enable it to buy all the loans we need this month, as well as

provide the remaining 30% advance on our senior line of credit with you, if needed.  I have been working with my investors to try not to take it from Argon, but if needed, we will be able to draw whatever equity is required from Argon to complete a $7 mm draw on the Hamilton line by the end of February."

63.     On February 23, 2016, Hamilton served a Notice of Event of Default of the Hamilton Loan for failure to replace defaulted receivables. Hamilton accelerated the balance of the loan and sought payment of $4,437,700.17, which consisted of $3,274,629 in principal.

64.     On March 3, 2016, Hamilton took exclusive control of the Spartan Bank Account and began sweeping the cash which Argon Credit was depositing into the account.  Upon information and belief, Hamilton swept at least $705,000 from the Spartan Bank Account.

65.     While SSF SPV and FTAM were engaged in discussions with Hamilton regarding the default under their loan agreements, FTAM and SSF separately engaged in discussions with Argon Credit to repurchase the consumer loans which were Hamilton's collateral.

66.     Upon information and belief, the plan to transfer the consumer loans back to Argon Credit was to hide those assets from Hamilton and prevent any further sweeps of the Spartan Bank Account by Hamilton.

67.     Argon Credit and FTAM executed a repurchase agreement dated March 1, 2016 pursuant to which Argon Credit agreed to repurchase from FTAM the entire pool of consumer loan assets with original principal notes totaling $4,843,024.67 which would be immediately transferred to Argon Credit upon the execution of the agreement.

68.     In consideration for the transfer of the assets, Argon Credit agreed that FTAM would continue to receive the future revenue streams from the loans until the earlier of 18 months or September 30, 2017.

69.     On information and belief, the repurchase agreement was backdated by several weeks and was actually signed on or about March 24, 2016.

70.     Also on March 24, 2016, upon information and belief, SSF SPV sent a letter to Hamilton, rejecting its notices of default and asserting a right to cure such defaults of the Hamilton Loan Agreement.

71.     Despite the purported repurchase agreement, on information and belief the consumer loans were not transferred back to Argon Credit.

72.     SSF SPV filed a voluntary petition for chapter 11 bankruptcy in the Southern District of New York on June 29, 2016 and listed in its schedules of assets and liabilities a loan portfolio having a value of $4,750,000.00.

73.     In that bankruptcy case, Ferro submitted a proof of claim against SSF SPV on behalf of Argon Credit alleging that Argon Credit was owed $712,500 in servicing fees on account of the Servicing Agreement.

**D. Defendants Knowingly Submitted False or Misleading Financial Reports to Princeton**

74.     In addition to the foregoing, on information and belief, Argon Credit's officers and board of managers caused Argon Credit to knowingly submit false or misleading financial reports to Princeton.

75.     For example, Argon Credit submitted financial statements, including a balance sheet and borrowing base certificate, to Princeton for the period ending December 31, 2015 which reflected $38,833,915 in accounts receivable, which did not include any allowance for doubtful accounts.  However, Argon Credit's internal balance sheet reflected only $29,982,455 in accounts receivable, which included an allowance of negative $5,376,501 for doubtful accounts.

76.     Argon Credit also submitted financial statements to Princeton dated March 20, 2016, for the period ending February 28, 2016 which reflected $38,320,266 in accounts receivable, which did not include an allowance for doubtful accounts.  However, Argon Credit's internal balance sheet dated just two weeks later on April 5, 2016 reflected only $29,723,922 in accounts receivable, which included an allowance of negative $5,465,289 for doubtful accounts.

77.     Even worse, on or about August 25, 2016, the Individual Defendants, among others, attended a board meeting in which those present discussed the Debtors' balance sheet and income statement as of July 31, 2016 as well as a draft report of the Debtors' 2015 consolidated financial statements performed by an independent accounting firm.

78.     The balance sheet as of July 31, 2016 circulated to those present reflected total assets of $34,298,154.38, which included an allowance for doubtful accounts of -$6,383,492.43.

79.     On information and belief, the draft report of the Debtors' 2015 consolidated financial statements reflected total assets of $32,992,577.

80.     Nevertheless, the July 2016 balance sheet submitted to Princeton in mid-August 2016 reflected $40,419,664.38 in assets and did not include a $6 million deduction for doubtful accounts.

81.     The Debtors did not inform Princeton of the over-inflated financials until on or about December 7, 2016 at which time Princeton immediately provided the Debtors with notice of intent to call the loan.

82.     Thus, the Individual Defendants assisted the Debtors in keeping two sets of books and records – one set for internal purposes and one set for submission to Princeton to permit Argon X to continue borrowing against its credit facility.

**E.  Argon Credit's Equity Structure and Equity Contributions Disguised as Loans**

83.    Argon Credit originally had three members: Noax, LLC ("*Noax*"), B Money Holdings, LLC ("*B Money*"), and Gary Zumski.

84.    Noax is, on information and belief, owned and controlled by Raviv Wolfe.

85.    B Money is, on information and belief, owned and controlled by Berj Arakelian.

86.    Through a series of subsequent transactions, Argon Credit expanded its members to include Margon, LLC, Little Owl Argon LLC, Mark Triffler Declaration of Trust Dated December 5, 1991, and The Cardinal Trust (collectively, the "*New Investors*").

87.    Each of the New Investors purportedly loaned money to Argon Credit for which they received promissory notes that required quarterly interest payments at a specified annual percentage rate with a maturity date several years later.

88.    The amounts purportedly loaned by the New Investors are summarized follows:

| New Investor | Total Purported Loan |
|---|---|
| Margon, LLC | $1,365,000 |
| Little Owl Argon LLC | $7,000,000 |
| Triffler Declaration of Trust dated December 5, 1991 | $1,000,000 |
| The Cardinal Trust | $1,000,000 |
| **Total:** | **$10,365,000** |

89.    Contemporaneously with the promissory notes, Argon Credit and the New Investors also executed subscription agreements pursuant to which the New Investors acquired membership interests of Argon Credit commensurate with the amount of their purported loans.

90.    Thus, Argon Credit's officers and board of managers caused Argon Credit to incur more than $10 million in purported debt under promissory notes payable to equity owners who obtained their equity interests for no additional consideration.

91.    In purpose and effect, these supposed loans were equity contributions.

92.     Between February 2015 and the December 16, 2016, Argon Credit made at least

$2,038,373.41 in interest payments to the New Investors, which were really equity distributions,

summarized as follows:

| New Investor | Total Payments |
|---|---|
| Margon, LLC | $1,023,611.12 |
| Little Owl Argon LLC | $847,595.63 |
| Triffler Declaration of Trust dated December 5, 1991 | $99,444.44 |
| The Cardinal Trust | $74,722.22 |
| **Total:** | **$2,038,373.41** |

**F. Commissions Paid to Broadmark and Peraza**

93.     In April 2015, Argon Credit purportedly entered into a services agreement (the

"*Broadmark Agreement*") with Broadmark and Alhambra Circle Partners, LLC ("*Alhambra*") to

employ Broadmark and Alhambra to assist it with certain debt and capital raise efforts.

94.     Alhambra is owned by its principal, Bruce Goldstein.

95.     The Broadmark Agreement is dated April 21, 2015, only nine days prior to the

date of the Fintech Loan Agreement, and was signed by Broadmark on April 30, 2015, one day

prior to the date of the Fintech Loan Agreement.

96.     Broadmark and Alhambra purportedly assisted the Debtors in connection with

obtaining the Princeton loan, equity transactions with Little Owl, Triffler Trust, and Cardinal

Trust, and the transactions with Spartan.

97.     At some point subsequent to entering into the Broadmark Agreement, Alhambra

disassociated from Broadmark and began working with Peraza.

98.     No formal assignment of the Broadmark Agreement was ever made to Peraza.

99.     The Fintech Loan Agreement's terms regarding use of proceeds permitted

payment of transaction fees only out of the initial draw.

16

100.    The First Amendment to the Fintech Loan Agreement expressly prohibited use of loan proceeds to pay commissions or finder's fees.

101.    Between May 2015 and June 2016, Argon Credit made several transfers to Broadmark totaling $528,333.33 (the "*Broadmark Transfers*") on account of purported consulting fees owed under the Broadmark Agreement, as set forth in Exhibit 1 to this Complaint.

102.    At least $360,000 of the Broadmark Transfers were attributed to finder's fees purportedly earned for procuring the Princeton loan.

103.    On information and belief, certain of the Broadmark Transfers are traceable to Princeton loan proceeds subsequent to the initial draw.

104.    These commissions were not disclosed to Fintech or Princeton.

105.    Additionally, between November 2015 and June 2016, Argon Credit made several transfers to Peraza totaling $248,791.67 (the "*Peraza Transfers*") on account of purported consulting fees, as set forth in Exhibit 2 to this Complaint.

106.    At least $180,000 of the Peraza Transfers were on account of the Princeton loan.

107.    However, no consulting fees were ever owed to Peraza because the Broadmark Agreement was never assigned to Peraza and no other written agreement existed between Argon Credit and Peraza with respect to alleged commissions.

108.    Indeed, Peraza filed a proof of claim against Argon Credit admitting that "[o]n further consideration, Peraza determined that the claim is properly and entirely owed to Broadmark."

**G.  Transfers to or for the Benefit of Insiders**

109.    During the two year period of Argon Credit's operations, Wolfe, Zumski, Arakelian, and Tomaszkiewicz caused Argon Credit to pay hundreds of thousands of dollars to or for their own benefit, often times for little or no value to Argon Credit.

     i.   <u>Bergarviv Transfers</u>

110.    For example, between May 11, 2015 and October 2, 2015, Argon Credit paid $381,000 (the "*Bergarviv Transfers*") to Bergarviv, which is owned in whole or in part by Arakelian and Wolfe through their respective companies B Money and Noax.  A summary of the Bergarviv Transfers is attached hereto as <u>Exhibit 3</u>.

111.    The Bergarviv Transfers were purportedly on account of commissions owed to Bergarviv relating to the Princeton loan.

112.    However, both B Money and Noax were already equity owners of Argon Credit and Wolfe and Arakelian both received salaries from Argon Credit during that time period.

113.    On information and belief, these commissions were not disclosed to or approved by Argon Credit's board of managers.

     ii.   <u>Personal Las Vegas Trip</u>

114.    Additionally, in October 2015, Wolfe caused Argon Credit to pay more than $7,000 (the "*Las Vegas Trip Expenses*") in airfare, hotel, meal, and entertainment charges for certain of the Debtors' executives to take a weekend getaway in Las Vegas, Nevada to celebrate an increase in the Princeton credit facility.

115.    Argon Credit did not receive any value in exchange for the Las Vegas Trip Expenses and these transfers were made at a time when Argon Credit was struggling financially and was insolvent.

### iii.   Blue Treble Payments

116.   Wolfe and Tomaszkiewicz, both officers of Argon Credit, caused Argon Credit to enter into an arrangement with Blue Treble, an entity owned and managed by Tomaszkiewicz, purportedly to develop software on behalf of Argon Credit.

117.   However, Tomaszkiewicz was already an officer of Argon Credit and obligated to perform his duties for the benefit of Argon Credit.

118.   Instead, Tomaszkiewicz took advantage of Argon Credit and caused Argon Credit to make hundreds of thousands of dollars in payments to Blue Treble for his personal benefit.

119.   Specifically, during the two year period prior to the Petition Date, Argon Credit made transfers to Blue Treble totaling at least $214,050.28 (the "*Blue Treble Two Year Payments*"), including at least $52,643.00 (the "*Blue Treble One Year Payments*" together with the Blue Treble Two Year Payments, the "*Blue Treble Payments*") in the year prior to the Petition Date.  A list of the Blue Treble Payments is attached hereto as Exhibit 4.

### iv.   Catalyst Lease for Personal Apartment

120.   In May 2016, Wolfe also caused Argon Credit to enter into a six-month apartment lease (the "*Catalyst Lease*") with Gateway Catalyst THC, LLC in May 2016 for a monthly rent of $2,680.00.

121.   The Catalyst Lease identified Wolfe as the occupant of the apartment located at 123 North Des Plaines, Chicago, IL 60661.

122.   The Debtors' business operations did not require the use of a residential apartment and, upon information and belief, Wolfe and other Argon Credit employees used the apartment for personal, rather than business, use.

123.    Morever, Wolfe caused Argon Credit to pay for tens of thousands of dollars of his personal expenses including:

1.  Tires for his car;

2.  Food and alcohol purchases;

3.  iTunes purchases; and

4.  At least $18,145.51 on Wolfe's personal Discover card and $24,718.84 on Wolfe's personal American Express card.

124.    Finally, after Princeton called default of the Fintech Loan Agreements in December 2016, it proposed certain cuts to the Debtors' operations, including a demand that senior management not be paid with the upcoming Friday, December 16, 2016 payroll.

125.    Instead, on the eve of the Debtors' bankruptcy filing, Wolfe and Zumski did the exact opposite and caused Argon Credit to add each of them to Argon Credit's payroll processor, The Synergy Companies, Inc., for the very first time in order to pay themselves tens of thousands of dollars in purported vacation and "incentive" time for 2014 and 2015.

126.    Specifically, on or about December 16, 2016, the Debtors' Petition Date, Argon Credit's payroll processor caused to be paid to Wolfe $57,992.30 (the "*Wolfe Incentive Payments*") in vacation and incentive time for 2014 and 2015 on behalf of Argon Credit.

127.    On that same date, Argon Credit's payroll processor caused to be paid to Zumski $31,664.80 (the "*Zumski Incentive Payments*") in vacation and incentive time for 2014 and 2015 on behalf of Argon Credit.

128.    No other Argon Credit employees received any payment for purported incentive time during that same payroll period.

**H. Argon Credit's Financial Condition**

129.    Argon Credit's books and records reflect that it was insolvent at all times relevant to this Complaint.

130.    Argon Credit's tax return for the calendar year ending December 31, 2014 states that it had total operating income of only $136,834, yet it took on $365,000 in purported debt to Margon under the First Margon Loan during that same time period.

131.    Specifically, Argon Credit's internal balance sheet reflects that as of January 31, 2015, Argon Credit's assets totaled $2,099,819.62 and its liabilities totaled $2,108,460.65, resulting in negative equity of $8,641.03.

132.    From that point forward, Argon Credit's financial condition deteriorated each month that it continued to operate and its negative equity balance increased each month.

133.    An independent accountant's review of Argon Credit's finances reflected that as of December 31, 2015, Argon Credit had negative equity of $11,285,946.

134.    That same accountant's review stated that Argon Credit had suffered recurring losses from operations, including a net loss of $11,208,708 for the year ended December 31, 2015.

135.    As of November 30, 2016, Argon Credit's internal balance sheet reflects assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative $7,162,685.51 in equity.

**I. Debtors' Bankruptcy Filings**

136.    On December 16, 2016 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

137.    On January 11, 2017, the Debtors' bankruptcy cases were converted from cases under chapter 11 to cases under chapter 7.

138.    The Trustee was appointed as interim chapter 7 trustee on April 17, 2017 and confirmed by the Court on July 6, 2017.

## COUNT I

**(Breach of Fiduciary Duty Against Wolfe, Zumski, Ferro, Arakelian, Schnosenberg, Tomaszkiewicz, Madanyan, Canfora, Triffler, Kulhman, Breitweiser, and Faermark)**

139.    The Trustee repeats, realleges, and incorporates paragraphs 1 through 138 of the Complaint as if fully set forth herein.

140.    At all times relevant to this Complaint, as applicable to each, Wolfe, Zumski, Ferro, Arakelian, Schnosenberg, Tomaszkiewicz, Madanyan, Canfora, Triffler, Kulhman, Breitweiser, and Faermark owed fiduciary duties of care and loyalty to Argon Credit because they were officers or members of Argon Credit's board of managers.

141.    Specifically, Wolfe breached his fiduciary duty of loyalty by engaging in, among other things, one or more of the following acts:

1.   Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans to or for the benefit of companies in which, on information and belief, Wolfe had a personal financial interest given that he guaranteed FTAM's loan with Hamilton;

2.   Authorizing Argon Credit to pay $381,000 to Bergarviv in purported commissions which personally benefitted Wolfe and which were not disclosed to or authorized by Argon Credit's board of managers;

3.   Authorizing Argon Credit to pay himself $57,992.30 for purported vacation time and 2014 and 2015 "incentive time" on the eve of Argon Credit's bankruptcy filing; and

4.   Authorizing Argon Credit to pay for his personal expenses which did not benefit Argon Credit, including tires for his vehicle, food and entertainment, the Catalyst Lease, and the Las Vegas Trip.

142.    Zumski breached his fiduciary duty of loyalty by authorizing Argon Credit to pay himself $31,664.80 for purported vacation time and 2014 and 2015 "incentive time" on the eve of Argon Credit's bankruptcy filing.

143.    Arakelian breached his fiduciary duty of loyalty by among other things, authorizing Argon Credit to pay $381,000 to Bergarviv in purported commissions which personally benefitted Arakelian and which were not disclosed to or authorized by Argon Credit's board of managers.

144.    Tomaszkiewicz breached his fiduciary duty of loyalty by entering into an arrangement with Argon Credit on behalf of his company, Blue Treble, to pay himself more than $214,000 for supposed software development services at a time Tomaszkiewicz was already employed by Argon Credit and receiving a salary and which fees were exorbitant in relation to the purported services provided.

145.    In taking these actions, Wolfe, Zumski, Arakelian, Tomaszkiewicz did not place the best interests of Argon Credit over other interests.  Instead, they authorized transactions on which they appeared on both sides and took actions that benefitted themselves personally at the expense of Argon Credit.

146.    Wolfe also breached his fiduciary duty of care by engaging in, among other things, one or more of the following acts:

    1.  Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans for which Argon Credit did not receive reasonably equivalent value;

    2.  Causing Argon Credit to double-pledge certain consumer loans to Princeton which were actually sold to FTAM, thereby causing Argon Credit to be in breach of the Fintech Loan Agreement;

3.  Causing Argon Credit to submit false financial information to Princeton which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more funds from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements;

4.  Causing Argon Credit to enter into the Broadmark Agreement and pay more than $700,000 to Broadmark and Peraza for commissions which were exorbitant, above market rate, and for which Argon Credit did not receive reasonably equivalent value; and

5.  Causing Argon Credit to pay millions of dollars to Margon, Little Owl, Triffler Trust, and Cardinal Trust which were, in reality, equity distributions to members at a time when Argon Credit was insolvent.

147.   Triffler, Kuhlman, Canfora, and Zumski, breached their fiduciary duties of care by engaging in, among other things, one or more of the following acts:

1.  Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans for which Argon Credit did not receive reasonably equivalent value;

2.  Causing Argon Credit to double-pledge certain consumer loans to Princeton which were actually sold to FTAM which caused Argon Credit to be in breach of the Fintech Loan Agreement;

3.  Causing Argon Credit to submit false financial information or failing to correct such information submitted to Princeton, which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more debt from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements;

4.  Causing Argon Credit to enter into the Broadmark Agreement and pay more than $700,000 to Broadmark and Peraza for commissions which were exorbitant, above market rate, and for which Argon Credit did not receive reasonably equivalent value; and

5.  Causing Argon Credit to pay millions of dollars to Margon, Little Owl, Triffler Trust, and Cardinal Trust which were, in reality, equity distributions to members at a time when Argon Credit was insolvent.

148.    Breitweiser, Faermark, Schnosenberg, and Ferro breached their fiduciary duties of care by among other things, causing Argon Credit to submit false financial information or failing to correct such information submitted to Princeton, which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more funds from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements.

149.    In taking these actions, the Individual Defendants were grossly negligent because they caused Argon Credit to incur more debt to Princeton than it was entitled to borrow with insufficient assets to collateralize such loan, cause Argon Credit to breach its loan agreements with Princeton, and make millions of dollars in equity distributions and pay above market rate for alleged services while Argon Credit was insolvent.

150.    These breaches of fiduciary duty of loyalty and care caused damages to Argon Credit and its creditors in an amount to be determined at trial.

## COUNT II

### (Aiding and Abetting Breach of Fiduciary Duty Against Barry Kostiner)

151.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

152.    At all times relevant to this Complaint, Wolfe owed fiduciary duties of loyalty and care to Argon Credit because he was an officer and a member of Argon Credit's board of members.

153.    Wolfe repeatedly breached his fiduciary duties of loyalty by authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans to or for the benefit of companies in which, on

information and belief, Wolfe had a personal financial interest given that he guaranteed FTAM's

loan with Hamilton.

154.    Wolfe also breached his fiduciary duties of care by engaging in, among other

things, one or more of the following acts:

1. Authorizing Argon Credit to enter into the series of transactions with Spartan pursuant to which Argon Credit sold approximately $4.7 million of its consumer loans for which Argon Credit did not receive reasonably equivalent value;

2. Causing Argon Credit to double-pledge certain consumer loans to Princeton which were actually sold to FTAM which caused Argon Credit to be in breach of the Fintech Loan Agreement; and

3. Causing Argon Credit to submit false financial information to Princeton which improperly inflated the amount of Argon Credit's accounts receivables, caused Argon Credit to borrow more debt from Princeton than it was permitted to borrow under the relevant loan agreements, and caused Argon Credit to be in breach of the relevant loan agreements.

155.    Kostiner knowingly participated with Wolfe to perform each of the acts described

above, including causing the Spartan entities to be incorporated, causing Spartan to execute the

series of documents pursuant to which Argon Credit's consumer loans were sold to FTAM,

causing Spartan to pay Argon Credit less than reasonably equivalent value in exchange for the

consumer loans, and causing Spartan not to pay any servicing fees due and owing to Argon

Credit of more than $700,000.

156.    While acting as a consultant for Argon Credit, Kostiner assisted Wolfe in

breaching his fiduciary to argon Credit by arranging for Spartan to purchase consumer loans

from Argon Credit without paying reasonably equivalent value in exchange for the consumer

loans, having Argon Credit first acquire loans on its balance sheet and in its portfolio before

assigning such loans to Spartan, executing a Memorandum of Understanding on or about July 2,

2015, which acknowledged that Spartan was funded from Argon Credit's balance sheet,

requesting and, upon information and belief, receiving copies of Argon Credit's financial statements while he was operating Spartan, and requesting and receiving notification of incoming wires to Argon Credit from Schnosenberg.

157.    Kostiner set up the Spartan entities while he worked for Argon Credit and used an Argon Credit e-mail address for Spartan's business transactions.

158.    Wolfe and Kostiner's actions caused significant harm to Argon Credit because it caused Argon Credit to incur more debt to Princeton than it was entitled to borrow with insufficient assets to collateralize such loan, caused Argon Credit to breach its loan agreements with Princeton, and ultimately funneled millions in assets away from Argon Credit without Argon Credit receiving equivalent value in exchange.

159.    Kostiner's actions caused damages to Argon Credit in an amount to be determined at trial.

## COUNT III

**(Avoidance of Preference Period Transfers
Pursuant to 11 U.S.C. § 547 Against Wolfe and Zumski)**

160.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

161.    During the (90) day period prior to the Petition Date, Argon Credit made the Zumski Incentive Payments and Wolfe Incentive Payments (collectively, the "*Incentive Payments*") to Zumski and Wolfe, respectively

162.    Each Incentive Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name which was transferred to Argon Credit's payroll processor with the specific direction to transfer those funds to Zumski and Wolfe in the amount of the Incentive Payments.

163.    Each of the Incentive Payments was a transfer to, or for the benefit of, the Zumski and Wolfe because each Incentive Payment either reduced or fully satisfied a debt then owed by Argon Credit to Zumski and Wolfe for vacation and incentive time owed to them.

164.    Each Incentive Payment was made for, or on account of, an antecedent debt owed by Argon Credit to Zumski and Wolfe before such Incentive Payments were made.

165.    Based on Argon Credit's books and records and negative equity balance since at least January 31, 2015, each Incentive Payment was made while Argon Credit was insolvent.

166.    Furthermore, pursuant to section 547(f) of the Bankruptcy Code, Argon Credit is presumed to have been insolvent during the 90 days prior to the Petition Date and is therefore presumed to have been insolvent on the date of the Incentive Payments.

167.    Each Incentive Payment was made on or within 90 days prior to the Petition Date.

168.    Each Incentive Payment enabled Zumski and Wolfe to receive more than they would receive if:

1.    Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

2.    such Incentive Payments had not been made; and

3.    Zumski and Wolfe received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

169.    By reason of the foregoing, the Trustee may avoid the Incentive Payments as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

### COUNT IV

**(In the Alternative to Count III, Avoidance of Fraudulent Transfers
Pursuant to 11 U.S.C. § 548(a)(1)(B) Against Wolfe and Zumski)**

170.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

171.    Argon Credit made the Zumski Incentive Payments and Wolfe Incentive Payments (collectively, the "*Incentive Payments*") to Zumski and Wolfe, respectively.

172.    Each Incentive Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name which was transferred to Argon Credit's payroll processor with the specific direction to transfer those funds to Zumski and Wolfe in the amount of the Incentive Payments.

173.    Each Incentive Payment was made within the two years prior to the Petition Date.

174.    To the extent that the Incentive Payments were not made on account of antecedent debts owed by Argon Credit to Wolfe and Zumski, Argon Credit did not receive reasonably equivalent value in exchange for the Incentive Payments.

175.    Argon Credit's liabilities exceeded its assets at the time of each of the Incentive Payment, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

176.    Accordingly, on the date each Incentive Payment was made, Argon Credit:

     i.    was insolvent or became insolvent as a result of the Incentive Payments;

     ii.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

     iii.    intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

177.    For these reasons, the Trustee may avoid the Incentive Payments as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT V

### (Avoidance of Preference Period Transfers
### Pursuant to 11 U.S.C. § 547 Against Arakelian)

178.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

179.    During the ninety days prior to the Petition Date, Argon Credit made two payments totaling $15,000 (the "*Arakelian Payments*") to Arakelian consisting of a wire transfer in the amount of $7,500 on November 4, 2016 and a wire transfer in the amount of $7,500 on December 1, 2016.

180.    Each Arakelian Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

181.    Each of the Arakelian Payments was a transfer to, or for the benefit of, Arakelian because each Arakelian Payment either reduced or fully satisfied a debt then owed by Argon Credit to Arakelian on account of a promissory note.

182.    Each Arakelian Payment was made for, or on account of, an antecedent debt owed by Argon Credit to Arakelian before such Arakelian Payment was made.

183.    Based on Argon Credit's books and records and negative equity balance since at least January 31, 2015, each Arakelian Payment was made while Argon Credit was insolvent.

184.    Furthermore, pursuant to section 547(f) of the Bankruptcy Code, Argon Credit is presumed to have been insolvent during the 90 days prior to the Petition Date and is therefore presumed to have been insolvent on the dates of the Arakelian Payments.

185.    Each Arakelian Payment was made on or within 90 days prior to the Petition Date.

186.    Each Arakelian Payment enabled Arakelian to receive more than he would receive if:

    1.    Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

    2.    such Arakelian Payments had not been made; and

    3.    Arakelian received payment of such debts to the extent provided by the provisions of the Bankruptcy Code.

187.    By reason of the foregoing, the Trustee may avoid the Arakelian Payments as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

## COUNT VI

### (In the Alternative to Count V, Avoidance of Fraudulent Transfers Under 11 U.S.C. §548(a)(1)(B) Against Arakelian)

188.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

189.    During the ninety days prior to the Petition Date, Argon Credit made two payments totaling $15,000 (the "*Arakelian Payments*") to Arakelian consisting of a wire transfer in the amount of $7,500 on November 4, 2016 and a wire transfer in the amount of $7,500 on December 1, 2016.

190.    Each Arakelian Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

191.    Each Arakelian Payment was made within the two years prior to the Petition Date.

192.    To the extent that the Arakelian Payments were not made on account of antecedent debts owed by Argon Credit to Arakelian, Argon Credit did not receive reasonably equivalent value in exchange for the Arakelian Payments.

193.   Argon Credit's liabilities exceeded its assets at the time of each of the Arakelian Payments, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

194.   Accordingly, on the date each Arakelian Payment was made, Argon Credit:

> i.   was insolvent or became insolvent as a result of the Arakelian Payment;
>
> ii.   was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or
>
> iii.   intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

195.   For these reasons, the Trustee may avoid the Arakelian Payments as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT VII

### (Avoidance of Fraudulent Transfers Under 11 U.S.C. §548(a)(1)(B) Against Bergarviv)

196.   The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

197.   Each Bergarviv Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

198.   Each Bergarviv Transfer was made within the two years prior to the Petition Date.

199.   On information and belief, each Bergarviv Transfer was not made on account of an antecedent debt owed by Argon Credit to Bergarviv because transfers were made on account of purported commissions owed in connection with the Princeton loan which were not disclosed to or authorized by Argon Credit's board of managers.

200.    Additionally, Argon Credit did not receive reasonably equivalent value in exchange for the Bergarviv Transfers because B Money and Noax were already equity owners of Argon Credit and Raviv Wolfe received a salary from Argon Credit of approximately $116,000 between November 2014 and October 2015.

201.    Furthermore, Argon Credit paid more than $500,000 to or for the benefit of Broadmark and Peraza, representing purported commissions owed in connection with the same Princeton loan.

202.    These commissions were not authorized by Argon Credit's board of managers or disclosed to Princeton and were substantially above market for any commissions which would be properly owed.

203.    Argon Credit's liabilities exceeded its assets at the time of each of the Bergarviv Transfers, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

204.    Accordingly, on the date each Bergarviv Transfer was made, Argon Credit:

    i.    was insolvent or became insolvent as a result of the Bergarviv Transfers;

    ii.    was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

    iii.    intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

205.    For these reasons, the Trustee may avoid the Bergarviv Transfers as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT VIII

**(Avoidance of Preferential Transfers to Blue Treble Pursuant to 11 U.S.C. § 547(b))**

206.     The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

207.     During the one year prior to the Petition Date, the Debtors continued to operate their business affairs, including the transfer of property, either by checks, cashier checks, wire transfers, direct deposit or otherwise to certain entities, including Blue Treble.

208.     During the one year prior to the Petition Date, Argon Credit made the Blue Treble One Year Payments to Blue Treble.

209.     Upon information and belief, Blue Treble was a creditor, within the meaning of section 101(10)(A) of the Bankruptcy Code, of Argon Credit at the time of each of the Blue Treble One Year Payments.

210.     Each Blue Treble One Year Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

211.     Each of the Blue Treble One Year Payments was a transfer to, or for the benefit of, Blue Treble because each Blue Treble One Year Payment either reduced or fully satisfied a debt then owed by Argon Credit to Blue Treble.

212.     Upon information and belief, each Blue Treble One Year Payment was made for, or on account of, an antecedent debt owed by Argon Credit to Blue Treble before such transfers were made.

213.     Argon Credit's liabilities exceeded its assets at the time of each of the Blue Treble One Year Payments.

214.     Specifically, Argon Credit's balance sheet ending January 31, 2016 reflects assets of $35,965,479.62 and liabilities of $44,194,338.59, resulting in negative $8,228,858.97 in equity and the balance sheet ending November 30, 2016 reflects assets of $47,946,047.81 and liabilities of $55,108,733.32, resulting in negative $7,162,685.51 in equity.

215.     Accordingly, each Blue Treble One Year Payments was made while Argon Credit was insolvent.

216.     At all times relevant to the Complaint, Blue Treble was an insider of Argon Credit because, on information and belief, Blue Treble was owned and/or controlled by Tomaszkiewicz who was Argon Credit's vice president of technology and business development and had the ability to direct Argon Credit's assets.

217.     Furthermore, on information and belief, the checks issued to Blue Treble were mailed to Tomaszkiewicz's home address and, effectively, Blue Treble and Tomaszkiewicz are one and the same.

218.     Each Blue Treble One Year Payment was made on or within one year prior to the Petition Date.

219.     Each Blue Treble One Year Payment enabled Blue Treble to receive more than it would receive if:

    1.  Argon Credit's case were a case under chapter 7 of the Bankruptcy Code;

    2.  such Blue Treble One Year Payment had not been made; and

    3.  the Blue Treble received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

220.     By reason of the foregoing, the Trustee may avoid the Blue Treble One Year Payments as preferential transfers pursuant to section 547(b) of the Bankruptcy Code.

35

## COUNT IX

### (In the Alternative to Count VIII, Avoidance of Fraudulent
### Transfers Under 11 U.S.C. §548(a)(1)(B))

221.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

222.    Each Blue Treble Two Year Payment constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

223.    Each Blue Treble Two Year Payment was made within the two years prior to the Petition Date.

224.    To the extent any of the Blue Treble Two Year Payments were not made on account of an antecedent debt owed by Argon Credit, Argon Credit did not receive reasonably equivalent value in exchange for the transfers.

225.    Argon Credit's liabilities exceeded its assets at the time of each of the Blue Treble Two Year Payments, including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

226.    Accordingly, on the date each Blue Treble Two Year Payment was made, Argon Credit:

1. was insolvent or became insolvent as a result of the Blue Treble Two Year Payment;

2. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

3. intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

36

227.    For these reasons and to the extent any of the Blue Treble Two Year Payments were not made on account of an antecedent debt owed by Argon Credit, the Trustee may avoid the Blue Treble Two Year Payments as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT X

**(Avoidance of Fraudulent Obligations and Transfers Under 11 U.S.C. § 548(a)(1)(B) Against Broadmark and Peraza)**

228.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 138 as though fully set forth herein.

229.    Each Broadmark Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

230.    Each Broadmark Transfer was made within the two years prior to the Petition Date.

231.    Each Broadmark Transfer was made to or for Broadmark's benefit.

232.    Argon Credit did not receive reasonably equivalent value in exchange for incurring the obligations under the Broadmark Agreement or for making the Broadmark Transfers because the parties entered into the Broadmark Agreement just days prior to the closing of the Fintech Loan Agreement, a time when the vast majority of the work performed to effectuate the transaction had already been done.

233.    Furthermore, the commissions to be paid to Broadmark under the Broadmark Agreement were exorbitant in light of market rates, the effort required, and the fact that certain of Argon Credit's officers, including Wolfe, already had responsibility for identifying borrowing opportunities and equity raising opportunities and were paid a salary for their efforts.

234.    Similarly, each Peraza Transfer constituted a transfer of an interest of Argon Credit in property; namely, cash from a deposit account in Argon Credit's name.

235.   Each Peraza Transfer was made within the two years prior to the Petition Date.

236.   Each Peraza Transfer was made to or for Peraza's benefit.

237.   Argon Credit did not receive reasonably equivalent value in exchange for the Peraza Transfers because: (i) Argon Credit did not owe any debt to Peraza and had no legal obligation to make the Peraza Transfers to Peraza, and (ii) for the reasons stated above, any commissions purportedly owed in connection with the Princeton loan, equity raises, or SSF sale were exorbitant, did not represent market value for the services provided, and Argon Credit's officers already had responsibility for identifying borrowing and equity raising opportunities.

238.   Argon Credit's liabilities exceeded its assets at the time of each of the Broadmark Transfers and Peraza Transfers (collectively, the "*Commission Payments*"), including negative balance sheet equity beginning in January 2015 and continuing through the Petition Date.

239.   Accordingly, on the date each Commission Payments were made and the obligations under the Broadmark Agreement incurred, Argon Credit:

1. was insolvent or became insolvent as a result of the Commission Payments and obligations under the Broadmark Agreement;

2. was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Argon Credit was unreasonably small capital; or

3. intended to incur, or believed it would incur, debts that would be beyond Argon Credit's ability to pay as such debts matured.

240.   For these reasons, the Trustee may avoid the Commission Payments and obligations under the Broadmark Agreement as fraudulent under 11 U.S.C. § 548(a)(1)(B).

## COUNT XI

### (Recovery of Avoidable Transfers Pursuant to 11 U.S.C. § 550)

241.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 240 as though fully set forth herein.

242.    Wolfe was either: (a) the initial transferee of the Wolfe Incentive Payments, (b) the entity for whose benefit the Wolfe Incentive Payments were made or (c) an immediate or mediate transferee of an initial transferee.

243.    Zumski was either: (a) the initial transferee of the Zumski Incentive Payments, (b) the entity for whose benefit the Zumski Incentive Payments were made or (c) an immediate or mediate transferee of an initial transferee.

244.    Arakelian was either: (a) the initial transferee of the Arakelian Payments, (b) the entity for whose benefit the Arakelian Payments were made or (c) an immediate or mediate transferee of an initial transferee.

245.    Bergarviv was either: (a) the initial transferee of the Bergarviv Transfers, (b) the entity for whose benefit the Bergarviv Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

246.    Blue Treble was either (a) the initial transferee of the Blue Treble Payments, (b) the entity for whose benefit the Blue Treble Payments were made or (c) an immediate or mediate transferee of an initial transferee.

247.    Broadmark was either (a) the initial transferee of the Broadmark Transfers, (b) the entity for whose benefit the Broadmark Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

248.    Peraza (together with Wolfe, Zumski, Arakelian, Bergarviv, Blue Treble, and Broadmark, the "*Transferee Defendants*") was either (a) the initial transferee of the Peraza Transfers (together with the Wolfe Incentive Payments, Zumski Incentive Payments, Arakelian Payments, Bergaviv Transfers, Blue Treble Payments, and Broadmark Transfers, the "*Challenged Transfers*"), (b) the entity for whose benefit the Peraza Transfers were made or (c) an immediate or mediate transferee of an initial transferee.

249.    To the extent that the Challenged Transfers are avoided pursuant to sections 547 or 548 of the Bankruptcy Code, the Trustee may recover the Challenged Transfers, or their value, from the applicable Transferee Defendants or any mediate or immediate transferee pursuant to section 550 of the Bankruptcy Code.

250.    By reason of the foregoing, the Trustee may recover the Challenged Transfers or the value thereof from the applicable Transferee Defendants pursuant to section 550 of the Bankruptcy Code.

## COUNT XII
### (Disallowance of Claims Pursuant to 11 U.S.C. § 502(d))

251.    The Trustee repeats and re-alleges the allegations of paragraphs 1 through 250 as though fully set forth herein.

252.    Section 502(d) of the Bankruptcy Code provides, in relevant part, that the claim of any entity or transferee receiving a payment that is avoidable under sections 547 or 548 of the Bankruptcy Code shall be disallowed unless the entity or transferee turns over the payment or value of the payment.

253.    The Transferee Defendants are the transferee of the Challenged Transfers.

254.    The Transferee Defendants have either filed proofs of claims against the Debtors, may have claims against the Debtors, or may assert claims against the Debtors in the future.

255.    The Transferee Defendants have neither paid nor surrendered the Challenged Transfers, or the value thereof, to Argon Credit's estate.

256.    The Trustee objects to any and all claims of the Transferee Defendants, including without limitation, all pre-petition and post-petition claims pursuant to section 502(d) of the Bankruptcy Code.

257.    By reason of the foregoing, any claim which the Transferee Defendants have filed must be disallowed pursuant to section 502(d) of the Bankruptcy Code until the Challenged Transfers, or the value thereof are returned to the Argon Credit's estate.

WHEREFORE, the Trustee requests the entry of a judgment against the Defendants granting the following relief:

(a) As to Count I, finding that: (i) Wolfe, Zumski, Arakelian, and Tomaszkiewicz are liable for breach of fiduciary duty of loyalty owed to Argon Credit and its creditors and awarding damages to the Trustee in an amount to be determined at trial; and (ii) the Individual Defendants are liable for breach of fiduciary duty of care owed to Argon Credit and its creditors and awarding damages to the Trustee in an amount to be determined at trial;

(b) As to Count II, entering judgment in favor of the Trustee and against Kostiner for aiding and abetting breaches of fiduciary duty owed to Argon Credit in an amount to be determined at trial;

(c) As to Count III, avoiding the Incentive Payments pursuant to section 547 of the Bankruptcy Code as follows: (i) as to Wolfe, avoiding the Wolfe Incentive Payments in the amount of $57,992.30, and (ii) as to Zumski, avoiding the Zumski Incentive Payments in the amount of $31,664.80;

(d) As to Count IV, in the alternative to Count III, avoiding the Incentive Payments pursuant to section 548 of the Bankruptcy Code as follows: (i) as to Wolfe, avoiding

41

the Wolfe Incentive Payments in the amount of $57,992.30, and (ii) as to Zumski, avoiding the Zumski Incentive Payments in the amount of $31,664.80;

(e) As to Count V, avoiding the Arakelian Payments pursuant to section 547 of the Bankruptcy Code in the amount of $15,000.00;

(f) As to Count VI, in the alternative to Count V, avoiding the Arakelian Payments pursuant to section 548 of the Bankruptcy Code in the amount of $15,000.00;

(g) As to Count VII, avoiding the Bergarviv Transfers pursuant to section 548 of the Bankruptcy Code in the amount of $381,000;

(h) As to Count VIII, avoiding the Blue Treble One Year Payments pursuant to section 547 of the Bankruptcy Code in the amount of $52,643;

(i) As to Count IX, in the alternative to Count VIII, avoiding the Blue Treble Two Year Payments pursuant to section 548 of the Bankruptcy Code in the amount of $214,050.28;

(j) As to Count X, avoiding the Commission Payments pursuant to section 548 of the Bankruptcy Code as follows: (i) as to Broadmark, avoiding the Broadmark Transfers in the amount of $528,333.33, and (ii) as to Peraza, avoiding the Peraza Transfers in the amount of $248,791.67;

(k) As to Count XI, ordering the Transferee Defendants to return the Challenged Transfers, as applicable, or their value to the Argon Credit's estate pursuant to section 550 of the Bankruptcy Code;

(l) As to Count XII, disallowing any claims of the Transferee Defendants pursuant to section 502(d) of the Bankruptcy Code unless and until the amount of the Challenged Transfers, or their value, as applicable, are returned to Argon Credit's estate;

(m) Award the Trustee pre-judgment interest at the legally allowable rate;

(n) Assess all fees and costs of this action against the Defendants; and

(o) Grant such other and further relief as is just and proper.

Dated:  December 14, 2018                **EUGENE CRANE, CHAPTER 7 TRUSTEE**

                                        By: /s/ Shelly A. DeRousse
                                             One of His Attorneys

                                        Shelly A. DeRousse, Esq.
                                        Elizabeth L. Janczak, Esq.
                                        FREEBORN & PETERS LLP
                                        311 South Wacker Drive, Suite 3000
                                        Chicago, Illinois 60606-6677
                                        Telephone:  312.360.6000
                                        Facsimile:   312.360.6520
                                        sderousse@freeborn.com
                                        ejanczak@freeborn.com